UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X


REPSOL YPF, S.A.[1],                                     :
                                                        :
                              Plaintiff,                :      12 Civ. 4018 (TPG)
                                                        :
              - against -                                :      ORAL ARGUMENT REQUESTED
                                                        :
THE REPUBLIC OF ARGENTINA,                              :
                                                        :
                              Defendant.                :

-------------------------------------------------------- X


## MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS THE COMPLAINT

LATHAM & WATKINS LLP
Miles N. Ruthberg
James E. Brandt
Christopher R. Harris
885 Third Avenue
New York, New York 10022
United States of America
Telephone: (212) 906-1200
Facsimile: (212) 751-4864

*Counsel for Plaintiff*

---

[1] Now known as Repsol, S.A.

TABLE OF CONTENTS

Page

INTRODUCTION ...................................................................................................1

ARGUMENT ........................................................................................................3

I.     THE COURT HAS SUBJECT MATTER JURISDICTION BASED ON
       DEFENDANT'S "COMMERCIAL ACTIVITY" UNDER THE FSIA ............................3

       A.     Defendant's Beneficial Ownership of More Than 5% of the Shares of a
              U.S.-Listed Issuer and Its Failure to File a Schedule 13D are "Commercial
              Activity Carried On in the United States" ................................................4
              1.     Defendant's Conduct Was and Remains Commercial in Nature ................5
                     a.     Standards for Commercial Conduct .................................5
                     b.     Defendant's "Course of Conduct" in the United States Was
                            Commercial ..............................................................5
                     c.     Defendant's "Particular . . . Transaction or Act" Was Also
                            Commercial ..............................................................7
                     d.     Defendant's Activity at Issue Is Not Sovereign ...................8
              2.     A Significant Nexus Exists Between the Conduct and the United
                     States .......................................................................10
       B.     Defendant's Actions Are Acts in Connection With Foreign Commercial
              Activity That Caused Direct Effects in the United States .........................11
              1.     Defendant's Acts Outside the Territory of the United States ...............11
              2.     Defendant's Commercial Activity in Argentina .........................11
              3.     Direct Effect in the United States from Defendant's Foreign
                     Commercial Activities ..................................................12
       C.     Congress Has Mandated That Foreign Governments Are Subject To, Not
              Immune From, Section 13(d) ..............................................................13

II.    THE COURT HAS PERSONAL JURISDICTION BECAUSE THERE IS
       SUBJECT MATTER JURISDICTION UNDER THE FSIA AND ARGENTINA
       DOES NOT DISPUTE THAT IT WAS PROPERLY SERVED ...................................14

III.   THE ACT OF STATE DOCTRINE IS IRRELEVANT BECAUSE REPSOL
       DOES NOT CHALLENGE THE EXPROPRIATION HERE ..........................................15

IV.    THE COMPLAINT ADEQUATELY STATES A CLAIM FOR THE LIMITED
       INJUNCTIVE RELIEF SOUGHT BY REPSOL ..................................................16

       A.     Courts Allow Claims for Failure to File a Schedule 13D to Proceed
              Without Considering the Standards Applicable to a Broader Claim for
              Injunctive Relief ............................................................................16
       B.     Repsol Easily Meets the Requirements for Injunctive Relief ......................18
              1.     There Is No Adequate Legal Remedy .......................................18
              2.     Irreparable Harm .........................................................19

a.    Defendant's Failure to Comply with Section 13(d) Injures All YPF Shareholders and Deprives All NYSE Market Participants of Material Information, in Defiance of the Williams Act ....................................................................19

b.    Defendant's Seizure of Control Before Completing the Expropriation and Without Making a Required Tender Offer Does Not Excuse Its Schedule 13D Filing Requirement ...............................................................20

c.    YPF's Disclosures as an SEC-Reporting Company Do Not Excuse Defendant's Non-Compliance with Its Own Disclosure and Filing Requirements as a Shareholder .................22

3.    The "Sliding Scale" Overwhelmingly Favors Requiring Defendant's Compliance with Section 13(d) ............................................23

V.    VENUE IS PROPER ....................................................................................24

CONCLUSION...........................................................................................................25

TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

*Adler v. Fed. Republic of Nigeria,*
   107 F.3d 720 (9th Cir. 1997) .................................................. 13

*American Construction Machinery & Equipment Corp. Ltd. v. Mechanised Construction of Pakistan Ltd.,*
   No. 85 Civ. 376, 1986 WL 2973 (S.D.N.Y. Mar. 5, 1986) ................................ 24, 25

*Bayerische Landesbank v. Aladdin Capital,*
   692 F.3d 42 (2d Cir. 2012)......................................................... 3, 23

*Bender v. Jordan,*
   439 F. Supp. 2d 139 (D. D.C. 2006) ......................................... 20

*Braka v. Multibanco Comermex, S.A.,*
   589 F. Supp. 802 (S.D.N.Y. 1984) ........................................... 7

*Callejo v. Bancomer, S.A.,*
   764 F.2d 1101 (5th Cir. 1985) ................................................ 7

*Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.,*
   598 F.3d 30 (2d Cir. 2010)......................................................... 18, 23

*Commercial Bank of Kuwait v. Rafidain Bank,*
   15 F.3d 238 (2d Cir. 1994)........................................................ 13

*Concesionaria DHM, S.A. v. International Finance Corp.,*
   307 F. Supp. 2d 553 (S.D.N.Y. 2004).......................................... 24

*Daventree Ltd. v. Republic of Azerbaijan,*
   349 F. Supp. 2d 736 (S.D.N.Y. 2004)............................................... *passim*

*E.ON AG v. Acciona, S.A.,*
   468 F. Supp. 2d 537 (S.D.N.Y. 2006)............................................. 17, 22

*EM Ltd. v. Republic of Argentina,*
   No. 08 Civ. 7974, 2009 U.S. Dist. LEXIS 91652 (S.D.N.Y. Sept. 30, 2009) ............ 9

*EM Ltd. v. Republic of Argentina,*
   473 F.3d 463 (2d Cir. N.Y. 2007)................................................ 2, 9

*GAF Corp. v. Milstein,*
   453 F.2d 709 (2d Cir. 1971)....................................................... 20, 21

*Gibbons v. Udaras na Gaeltachta,*
   549 F. Supp. 1094 (S.D.N.Y. 1982).......................................... 10

*Global Intellicom, Inc. v. Thomson Kernaghan & Co.,*
  No. 99 CIV 342 (DLC), 1999 WL 544708 (S.D.N.Y. July 27, 1999).........................17

*Guirlando v. T.C. Ziraat Bankasi A.S.,*
  602 F.3d 69 (2d Cir. 2010)...................................................................................10

*Hanil Bank v. PT. Bank Negara Indonesia (Persero),*
  148 F.3d 127 (2d Cir. 1998).................................................................................13

*ICN Pharmaceuticals, Inc. v. Khan,*
  2 F.3d 484 (2d Cir. 1993)...............................................................................17, 21

*Jackson v. People's Republic of China,*
  550 F. Supp. 869 (N.D. Ala. 1982)........................................................................7

*Keller v. Central  Bank of Nigeria,*
  277 F.3d 811 (6th Cir. 2002) ...............................................................................13

*Lightwater Corp. v. Republic of Argentina,*
  No. 02 Civ. 3804, 2003 WL 1878420 (S.D.N.Y. Apr. 14, 2003).....................15, 16

*Lyondell-CITGO Ref., LP v. Petroleos de Venezuela, S.A.,*
  No. 02 Civ. 0795, 2003 U.S. Dist. LEXIS 13809 (S.D.N.Y. Aug. 6, 2003) ............15

*Martin v. Republic of South Africa,*
  836 F.2d 91 (2d Cir. 1987)...................................................................................12

*Ministry of Supply, Cairo v. Universe Tankships, Inc.,*
  708 F.2d 80 (2d. Cir. 1983)...............................................................................5, 10

*Morales v. Quintel Entertainment, Inc.,*
  249 F.3d 115 (2d Cir. 2001).................................................................................21

*Morrison v. National Australia Bank Ltd.,*
  130 S. Ct. 2869 (2010).........................................................................................12

*Mortimer Off Shore Services, Ltd. v. Fed. Republic of Germany,*
  615 F.3d 97 (2d Cir. 2010)........................................................................7, 11, 12

*Nam Tai Electronics, Inc. v. Tele-Art, Inc.,*
  No. 93 Civ. 8024, 1994 WL 4438 (S.D.N.Y. Jan. 5, 1994)....................................17

*NML Capital v. Republic of Argentina,*
  680 F.3d 254 (2d Cir. 2012), *cert. denied,* 133 S. Ct. 273 (2012).............................9

*ODS Technologies, LP v. Marshall,*
  832 A.2d 1254 (Del. Ch. 2003)............................................................................20

*Patsy's Italian Restaurant, Inc. v. Banas*,
   658 F.3d 254 (2d Cir. 2011)................................................................. 18, 23

*Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*,
   235 F.3d 738 (2d Cir. 2000).................................................................. 4

*Repsol YPF, S.A. v. Republic of Argentina*,
   Civ. Action No. 12-3877 (May 15, 2012)........................................... 2

*Republic of Argentina v. Weltover, Inc.*,
   504 U.S. 607 (1992).................................................................. *passim*

*Rogers v. Petroleo Brasileiro, S.A.*,
   673 F.3d 131 (2d Cir. 2012)................................................................ 10

*Rondeau v. Mosinee Paper Corp.*,
   422 U.S. 49 (1975)........................................................... 17, 21, 24

*Saudi Arabia v. Nelson*,
   507 U.S. 349 (1993)................................................................ 4, 24

*Schmidt v. Polish People's Republic*,
   579 F. Supp. 23 (S.D.N.Y. 1984) ................................................... 12

*SEC v. Drexel Burnham Lambert, Inc.*,
   837 F. Supp. 587 (S.D.N.Y. 1993) ............................................ 1, 18

*SEC v. First City Financial Corp.*,
   890 F.2d 1215 (D.C. Cir. 1989) ..................................................... 1

*Sgalambo v. McKenzie*,
   739 F. Supp. 2d 453 (S.D.N.Y. 2010)............................................. 12

*Shapiro v. Republic of Bolivia*,
   930 F.2d 1013 (2d Cir. 1991)............................................... 5, 7, 14

*Tonoga, Ltd. v. Ministry of Public Works & Housing of the Kingdom of Saudi Arabia*,
   135 F. Supp. 2d 350 (N.D.N.Y. 2001)............................................ 25

*Treadway Cos. v. Care Corp.*,
   638 F.2d 357 (2d Cir. 1980).............................................. 17, 21, 24

*Turner Broadcasting System, Inc. v. F.C.C.*,
   520 U.S. 180 (1997)........................................................................ 19

*United States v. Giffen*,
   326 F. Supp. 2d 497 (S.D.N.Y. 2004)............................................. 16

*Verlinden B.V. v. Central Bank of Nigeria,*
  461 U.S. 480 (1983) ............................................................................................ 12

*W. S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l,*
  493 U.S. 400 (1990) ...................................................................................... 15, 16

*WMW Machinery, Inc. v. Werkzeugmaschinenhandel GmbH IM Aufbau,*
  960 F. Supp. 734 (S.D.N.Y. 1997) ......................................................................... 9

*Wolf v. Banco Nacional de Mexico, S.A.,*
  739 F.2d 1458 (9th Cir. 1984) .......................................................................... 5, 7

## REGULATIONS AND STATUTES

15 U.S.C.§ 78c(a)(9) ...................................................................................... 13, 16

15 U.S.C.§ 78c(c) ................................................................................................. 13

15 U.S.C.§ 78m(d)(1) ............................................................................... 13, 20, 21

15 U.S.C. § 78m(d)(1)(A)-(E) ........................................................................... 19

15 U.S.C. § 78m(d)(1)(B) ..................................................................................... 8

15 U.S.C.§ 78m(d)(1)(C) ...................................................................................... 8

15 U.S.C.§ 78m(d)(1)(E) ....................................................................................... 8

15 U.S.C. § 78m(d)(2) .................................................................................. 8, 20, 23

15 U.S.C. § 78m(d)(3) .......................................................................................... 20

17 C.F.R. § 240.10b5(b) ........................................................................................ 8

17 C.F.R. § 240.13d-2(a) .................................................................................. 20, 23

17 C.F.R. § 240.13d-101 .................................................................................. 19, 22

28 U.S.C. § 1391(f)(1) ................................................................................... *passim*

28 U.S.C. § 1603(d) ........................................................................................ 5, 10

28 U.S.C. §1605(a)(2) .................................................................................. 3, 4, 11

**LEGISLATIVE MATERIALS**

113 Cong. Rec. 855 (Jan. 18, 1967) (statement of Sen. Williams).................................................... 1

Ethiopis Tafara, *Testimony Concerning the Regulatory Framework for Sovereign Investments: Hearing Before the Senate Committee on Banking, Housing, and Urban Affairs* (Apr. 24, 2008), *available at* http://www.sec.gov/news/testimony/2008/ts0342408et.htm .............. 13, 14

*Full Disclosure of Corporate Equity Ownership and in Corporate Takeover Bids: Hearing Before the Subcommittee on Securities of the Senate Committee on Banking and Currency*, 90th Cong., 1st Sess. 2-3 (1967).................................................................................................. 19

H.R. Rep. No. 90-1711 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2811 ...................................... 22

H.R. Res. 686, 112th Cong. (2012)................................................................................................ 2

S. Rep. No. 90-550 (1967)............................................................................................................ 22

# INTRODUCTION

Remarkably, Defendant the Republic of Argentina ("Defendant" or "Argentina")

concedes that it has intentionally violated a core investor protection requirement in U.S. law—

that any person (including a foreign government) who acquires beneficial ownership of more

than 5% of a security registered with the SEC must file a Schedule 13D with its mandated

disclosures, and must update those disclosures as necessary.[2]  In its Motion to Dismiss ("Def.'s

Mot."), Defendant concedes that:

- it intentionally participated in the U.S. securities markets by acquiring and holding more than 5% beneficial ownership (and indeed control) of YPF, S.A. ("YPF" or the "Company"), an SEC-registered company whose American Depositary Shares ("ADSs") are listed for trading on the New York Stock Exchange ("NYSE");

- Section 13(d) and Rule 13d-1 thus required it to file a Schedule 13D;

- it intentionally violated those laws by deciding not to file a Schedule 13D; and

- it plans to continue to violate U.S. securities laws by not filing a Schedule 13D in the future.

*See* Def.'s Mot. at 3, 9, 16.  These admissions are particularly disturbing given that "Section

13(d) is not a mere 'technical' reporting provision; it is, rather, the 'pivot' of a regulatory scheme

that may represent 'the only way that corporations, their shareholders and others can adequately

evaluate . . . the possible effects of a change in substantial shareholdings.'"  *SEC v. Drexel*

*Burnham Lambert, Inc*, 837 F. Supp. 587, 607 (S.D.N.Y. 1993) (quoting *SEC v. First City Fin.*

*Corp.*, 890 F.2d 1215, 1230, 1230 n.21 (D.C. Cir. 1989), in turn quoting statement of Senator

Williams, sponsor of the Williams Act, 113 Cong. Rec. 855 (Jan. 18, 1967)).  Repsol, S.A.

("Repsol") and other shareholders need this information, including Argentina's future (and to

---

[2] Capitalized terms not defined in this Introduction have the meanings defined below in the Argument section.

date undisclosed) plans for items such as dividends, directors, and possible sales of YPF assets or shares, to enable them to decide whether to keep or sell their own shares, and how to vote them.

Defendant's failure to file a Schedule 13D is the latest in a series of actions reflecting its belief that it is beyond the reach of U.S. law and courts.[3]  As noted in a separate lawsuit, when Defendant seized control of a 51% stake in YPF's securities (not its operating assets) in May 2012, it ignored a contractual obligation to make a tender offer to all outstanding shareholders.[4] Here, it seeks to defy U.S. securities laws as well.  Worse yet, Argentina wants it both ways: despite intentionally violating U.S. securities laws, Defendant has announced that *it intends to keep YPF registered* in the United States.[5]  It thus continues to benefit from the advantages of U.S. registration, including increased liquidity, the ability to access the markets in the future, and the prestige of trading on the NYSE.  In this way, Defendant hopes to reassure investors and potential partners that YPF remains an internationally-legitimate company, despite the fact that it is now controlled by a state whose track record does not inspire investor confidence.[6]

Defendant argues it is free deliberately to violate U.S. securities laws, and asks this Court to dismiss the Complaint ("Compl."), on two principal grounds.  First, Defendant asserts that its expropriation makes any action or decision it takes as a controlling shareholder of YPF

---

[3] Argentina has consistently ignored judgments of U.S. courts.  *See* H.R. Res. 686, 112th Cong. (2012) (noting Argentina's consistent evasion of "the judgments of United States courts").

[4] *See* Ex. 1, *Repsol YPF, S.A. v. Republic of Argentina*, Civ. Action No. 12-3877 (TPG) (May 15, 2012) [ECF No. 1] (the "Bylaws Compl.").  Citations to "Ex." refer to exhibits to the Declaration of Christopher Harris filed contemporaneously herewith.

[5] *See* Ex. 3, Victoria Ginzberg, *"We Will Take the Necessary Measures,"* PÁGINA 12, June 16, 2012 (statement by President Kirchner that "we chose to only to take that which allowed us control of the company, [and] remain on the New York Stock Exchange, which binds us to very important controls, by the Securities Commission of our country and the SEC (the Securities Commission of the United States)."), *available at* http://www.pagina12.com.ar/diario/elpais/1-196541-2012-06-16.html; *see also* Ex. 4, *State-Controlled YPF Wants to Keep Its ADS Listed in the New York Exchange*, MERCOPRESS, May 16, 2012, *available at* http://en.mercopress.com/2012/05/16/state-controlled-ypf-wants-to-keep-its-ads-listed-in-the-new-york-exchange.

[6] *See EM Ltd. v. Republic of Argentina*, 473 F.3d 463, 466 n.2 (2d Cir. 2007) ("We note that Argentina has made many contributions to the law of foreign insolvency through its numerous defaults on its sovereign obligations, as well as through what we might term a diplomacy of default.").

inherently sovereign, and beyond review by this Court.  However, Repsol does *not* here challenge the validity of the expropriation.[7]  Instead, the only conduct at issue is Argentina's quintessentially commercial conduct as the beneficial controlling owner of a publicly-traded company.  The obligations of a shareholder, private or sovereign, under Section 13(d) to disclose commercial information such as the source and amount of funds, plans to sell assets, or to make changes to the corporate structure, are inherently commercial.  And the particular method by which a shareholder acquires ownership is irrelevant under Section 13(d) (except that it must be disclosed).  Second, Defendant claims that it should be excused from making the admittedly-required disclosures because its takeover of YPF is complete, and Defendant has supposedly caused YPF to make select disclosures about it, albeit not those Section 13(d) requires.  But as the Exchange Act expressly applies to governments, and Section 13(d) contains no exception for majority shareholders, Defendant's disclosure duty remains.  Nor do any of Defendant's other arguments find any support in the language of Section 13(d) or case law.  Accordingly, as more fully explained below, Defendant's motion should be denied.

## ARGUMENT

In deciding a motion to dismiss, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor.  *See Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 51-52 (2d Cir. 2012).

## I.   THE COURT HAS SUBJECT MATTER JURISDICTION BASED ON DEFENDANT'S "COMMERCIAL ACTIVITY" UNDER THE FSIA

The Foreign Sovereign Immunities Act ("FSIA") creates jurisdiction for claims against foreign states based on "commercial activity" or "acts" by the sovereign.  *See* 28 U.S.C. §

---

[7] Although this lawsuit does not challenge the expropriation, Repsol reserves the right to do so in any forum Repsol deems appropriate, including the International Centre for Settlement of Investment Disputes.

1605(a)(2).  There are three bases for finding "commercial activity," any one of which is sufficient; in particular, a foreign state is not immune if the claim is:

> [1] based upon a commercial activity carried on in the United States by a foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

*Id.*  The "commercial activity" requirement is thus met if the basis for the lawsuit satisfies any of the three statutory clauses:  (1) "commercial activity carried on" in the United States; (2) an "act performed in" the United States in connection with commercial activity elsewhere; or (3) an "act outside" the United States in connection with foreign commercial activity that causes a "direct effect" in the United States.  *See id.*  Repsol's lawsuit here satisfies both the first and third clauses.  The course of conduct—taking YPF public, obtaining investors, making corporate decisions, and making partial disclosures—and the specific transaction—failing to make a disclosure in the United States due to a decision in Argentina—occurred both in the United States and Argentina.

> **A.** **Defendant's Beneficial Ownership of More Than 5% of the Shares of a U.S.-Listed Issuer and Its Failure to File a Schedule 13D are "Commercial Activity Carried On in the United States"**

Under the first clause, a claim must meet two requirements.  First, it must "be based upon some commercial activity by [a defendant] that had substantial contact with the United States."  *Reiss v. Societe Centrale Du Groupe Des Assurances Nationales*, 235 F.3d 738, 747 (2d Cir. 2000) (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 356 (1993)) (internal quotation marks omitted).  Second, "there must be a significant nexus . . . between the commercial activity in this country upon which the exception [to immunity] is based" and the cause of action.  *Reiss*, 235 F.3d at 747 (citation and internal quotation marks omitted).  Both requirements are met here.

4

### 1.     Defendant's Conduct Was and Remains Commercial in Nature

#### a.     Standards for Commercial Conduct

"[W]hen a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's acts are 'commercial' within the meaning of the FSIA." *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614-15 (1992).  In addition, "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose."  28 U.S.C. § 1603(d).

Moreover, "commercial activity" may be "*either* a regular course of commercial conduct *or* a particular commercial transaction or act." *Id.*  (emphasis added).  Jurisdiction is thus proper if the broader "course of conduct" is in the United States, even if the particular "transaction or act" at issue is not.  *See Ministry of Supply, Cairo v. Universe Tankships, Inc.*, 708 F.2d 80, 84 (2d. Cir. 1983) (asserting jurisdiction based on the "entire course of activity" at issue); *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 754 (S.D.N.Y. 2004) (same).

#### b.     Defendant's "Course of Conduct" in the United States Was Commercial

Courts have repeatedly held that a state's course of conduct in raising capital qualifies as "commercial activity."  *See Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1018 (2d Cir. 1991) ("It is self-evident that issuing public debt is a commercial activity . . . ."); *see also Wolf v. Banco Nacional de Mexico, S.A.*, 739 F.2d 1458, 1460 (9th Cir. 1984) (sale of certificate of deposit was commercial activity).  For example, in *Daventree*, jurisdiction was proper where the defendant sold vouchers for shares of state-run companies that would be privatized:

> While the Sovereign defendants may be correct that aspects of sovereignty inhere in the decision to privatize [the state-run company], once that decision has been made, the offering of vouchers and options to plaintiffs and other purchasers was commercial. To raise capital, the Sovereign defendants allegedly

> solicited buyers in Azerbaijan and the United States and navigated the world of private commerce to achieve their financial goals. *Thus, as in* Weltover, *although the purpose of offering privatization vouchers or issuing sovereign debts was public, the nature of that activity was private and commercial*.

349 F. Supp. 2d at 750 (emphasis added).

The course of conduct at issue here is "commercial" in nature. Defendant decided to privatize YPF and raise capital from the U.S. securities markets in the early 1990s through an IPO of YPF Class D shares registered with the Securities and Exchange Commission ("SEC"). *See* Compl. ¶ 12. The shares trade on the NYSE in the form of ADSs, as well as on the Buenos Aires Stock Exchange. Based on the sale of shares in the United States, Defendant as selling shareholder reaped $1.1 billion. *See id.* Currently, approximately 60% of Class D shares trade as ADSs on the NYSE. *See id.* Now, Defendant has acquired and continues to hold beneficial majority ownership of YPF's publicly-traded voting securities—itself inherently commercial activity, just as when done by Warren Buffett or Carl Icahn. Regardless of its method of acquisition, Defendant thus also has disclosure obligations, and has violated them by failing to divulge required commercial information about its plans as a shareholder. Moreover, Defendant recently commenced a "road show" in the United States to showcase YPF's new business plans and solicit investment in, and partnership with, the Company, with the first stop in New York.[8] It has thus itself continued to market YPF in the United States.

Accordingly, like the defendant in *Daventree*, here Defendant "raise[d] capital" by "solicit[ing] buyers" in the United States for shares in a company to be privatized, "and

---

[8] *See* Ex. 3, Victoria Ginzberg, *"We Will Take the Necessary Measures"*, Página 12, June 16, 2012 ("Regarding [YPF], [President Kirchner] announced a road show to 'make an offering of business, production, exploitation and services models.'"); Ex. 5, *Fernandez Meets in New York with the CEO of Exxon Mobil*, Finanzas, Sept. 28, 2012 (noting that "Argentina's President on Monday kicked off her U.S. visit with a meeting with the investor George Soros" and also met with Exxon Mobil CEO Rex Tillerson), *available at* http://www.finanzas.com/noticias/economia/20120928/fernandez-reune-nueva-york-1550479.html. It has thus itself continued to market YPF and seek to raise capital for it in the United States.

navigated the world of private commerce to achieve [its] financial goals." *Daventree*, 349 F. Supp. 2d at 750.  The "course of conduct" giving rise to the claims of Repsol YPF, S.A. (now known as Repsol, S.A.) ("Repsol") thus fits a paradigmatic pattern of commercial activity.  *See id.*; *see also Wolf*, 739 F.2d at 1460 (sale of debt instrument was commercial activity); *Shapiro*, 930 F.2d at 1019 (same for transmission of promissory note); *Jackson v. People's Republic of China*, 550 F. Supp. 869, 873 (N.D. Ala. 1982) (same for sale of bonds) (cited with approval in *Mortimer Off Shore Servs., Ltd. v. Fed. Republic of Germany*, 615 F.3d 97, 107 (2d Cir. 2010)).

### c.    Defendant's "Particular . . . Transaction or Act" Was Also Commercial

Furthermore, Defendant's "particular . . . transaction or act" at issue—having beneficial majority ownership of an SEC-reporting company, while refusing to file required disclosures, and instead causing YPF to make supposed partial disclosures, *see* Def.'s Mot. at 2, 18—is precisely the type of commercial activity for which sovereigns may be liable.  The act of making statements in connection with a securities transaction is "commercial" in nature.  *See Braka v. Multibanco Comermex, S.A.*, 589 F. Supp. 802, 805 (S.D.N.Y. 1984) (alleged claims based on "false statements in connection with the sale of securities" arose "out of the defendant's purely commercial activity"); *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1125 n.33 (5th Cir. 1985) (violation of securities law is not a sovereign act).

Just as the defendant in *Braka* acted in a commercial capacity by allegedly "ma[king] false statements in connection with the sale of securities," 589 F. Supp. at 805, here Defendant acted in a commercial capacity by *failing* to make a required disclosure, under laws to which it subjected itself in causing YPF's IPO and registration with the SEC.  Defendant does not dispute that it has majority beneficial ownership of YPF; that Section 13(d) and Rule 13d-1 under the Exchange Act ("Rule 13d-1") required it to file a Schedule 13D by May 17, 2012, *see* Compl. ¶

7

20; or that it failed to do so and thereby failed to provide the information specified in Section 13(d). This includes, among other items, the "source and amount of the funds or other consideration used or to be used" in completing the expropriation, 15 U.S.C. § 78m(d)(1)(B), "any plans or proposals . . . to liquidate [YPF], to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure," *id.* § 78m(d)(1)(C), information regarding "any contracts, arrangements, or understandings" related to YPF stock, *id.* § 78m(d)(1)(E), and any changes to plans or intentions, *see id.* § 78m(d)(2). This is commercial information, to be used by investors in making investment decisions.

The fact that Defendant made an omission (both of the Schedule 13D and of the information required to be disclosed therein) rather than a misrepresentation does not change the commercial nature of the act; the statute, the SEC rules, *see* 17 C.F.R. § 240.10b-5(b) (prohibiting misleading omissions), and the FSIA, *see* 28 U.S.C. § 1391(f)(1) (venue appropriate where "events or omissions giving rise to the claim occurred"), apply to omissions as well as misrepresentations. Nor can an omission be more inherently sovereign than a misrepresentation, given that both omissions and misrepresentations violate Section 13(d), and Section 13(d) expressly includes governments, *see infra* I.C. A private player, just like a sovereign, might prefer not to disclose "whether it intends to reorganize YPF, make additional investments in the business, or sell any part of the hydrocarbon infrastructure operated by YPF," Def.'s Mot. at 14, but the law still requires these mandated disclosures.

### d.    Defendant's Activity at Issue Is Not Sovereign

Whether or not Defendant's *expropriation* was sovereign is not at issue, because Repsol does not challenge the expropriation here, *see supra*, n.7. The particular *method* by which Defendant acquired beneficial ownership is irrelevant to Section 13(d) (except in that it needed to be disclosed). The entire course of conduct—taking YPF public and registering it in the

8

United States, then acquiring and holding beneficial majority ownership, and then choosing not to make SEC-mandated commercial disclosures but to keep YPF registered—is commercial, even if somewhere in the chronology a sovereign decision occurred that is not challenged here. For example, in *WMW Machinery v. Werkzeugmaschinenhandel GmbH IM Aufbau*, a German state agency's decisions about whether a formerly state-run company should be privatized, and how to regulate and manage the company, were deemed commercial, not sovereign, because they "reflect[ed] an exercise of powers that can also be exercised by private citizens."  960 F. Supp. 734, 740 (S.D.N.Y. 1997) (citation and internal quotation marks omitted).

 Nor does Defendant's motivation in "seeking to control its natural resources and maximize its energy independence," Def.'s Mot. at 9, excuse the required disclosures about its U.S.-registered stock.  By their nature, the disclosures (or lack thereof) here are "those that a controlling stockholder of a corporation might [make] as a player in the private market."  *WMW Mach.*, 960 F. Supp. at 740; *see also Weltover*, 504 U.S. at 617 ("[I]t is irrelevant *why* Argentina participated in the bond market in the manner of a private actor; it matters only that it did so." (emphasis in original)); *EM Ltd. v. Republic of Argentina*, No. 08 Civ. 7974 (TPG), 2009 U.S. Dist. LEXIS 91652, at *26-27 (S.D.N.Y. Sept. 30, 2009) (where Argentina acted "as a 'private player' in the marketplace," act was commercial regardless of purpose), *aff'd, NML Capital, Ltd. v. Republic of Argentina*, 680 F.3d 254, 258 (2d Cir.), *cert. denied*, 133 S. Ct. 273 (2012)).[9]

---

[9] *EM Ltd.*, 473 F.3d at 482-83, cited by Defendant, only underscores the lack of sovereign activity here.  In that case, the Second Circuit observed that the ability to borrow money from the International Monetary Fund ("IMF") was sovereign in nature precisely because *only governments can borrow from the IMF*. *Id.* ("Only sovereign nation states can become members of the IMF, and only members can avail themselves of IMF financing.") (internal citations omitted).  But anyone, sovereign or non-sovereign, can acquire 5% beneficial ownership of a public company.

## 2.   A Significant Nexus Exists Between the Conduct and the United States

A "significant nexus" exists between the United States and the "regular course of commercial conduct" underlying Repsol's claims.  *See Ministry of Supply, Cairo*, 708 F.2d at 84; 28 U.S.C. §1603(d).  Defendant caused YPF's securities to be marketed and sold in the United States, received more than $1 billion from the U.S. IPO, reacquired beneficial control of this U.S.-registered company thus triggering Section 13(d), and then engaged in a U.S. roadshow to market it.  *See* Compl. ¶ 12.  Moreover, because more than 60% of YPF's Class D shares continue to trade on the NYSE, *see id.*, the acquisition of control of 51% of YPF's stock thus necessarily included stock covered by NYSE-traded ADSs, affecting the U.S. securities markets and the information right of U.S. regulators and market participants.  *See id.*  This course of conduct in marketing, acquiring control of, and failing to make required disclosures regarding securities establishes the requisite nexus.  *See Daventree*, 349 F. Supp. 2d at 751 (finding nexus in part "[b]ecause solicitation of prospective buyers took place in the United States").

Likewise, the "particular transaction or act" also occurred in the United States.  28 U.S.C. § 1603(d).  Defendant failed to file a Schedule 13D with the SEC; that omission thus occurred in the United States.  *See Gibbons v. Udaras na Gaeltachta*, 549 F. Supp. 1094, 1109, 1114-15 (S.D.N.Y. 1982) (exercising jurisdiction under the first clause in part because defendant "failed to perform" under a contract requiring performance in the United States).[10]

---

[10] Defendant's reliance on *Rogers v. Petroleo Brasileiro, S.A.*, 673 F.3d 131, 138 (2d Cir. 2012) and *Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 76 (2d Cir. 2010) for the argument that a "decision by a foreign sovereign not to perform . . . is not an act in the United States" is misplaced.  Def.'s Mot. at 10.  *Rogers* and *Guirlando* are not relevant to this point because they discuss the "direct effect" test of the *third* clause, which focuses on a narrow "act," not the "substantial nexus" test of the *first* clause, which looks at a broader "course of commercial conduct."  Moreover, Congress intended both acts and omissions to be legally significant for purposes of evaluating the location of "commercial activity" under the first clause, as shown by the FSIA's venue provision, which provides that venue is proper "in any judicial district in which a substantial part of the events *or omissions giving rise to the claim occurred*."  28 U.S.C. § 1391(f)(1) (emphasis added).  If an omission that occurs in the United States, such as the failure to file a Schedule 13D with the SEC, cannot be an "act" or "activity" that confers jurisdiction, then the

**B.    Defendant's Actions Are Acts in Connection With Foreign Commercial Activity That Caused Direct Effects in the United States**

Even if Argentina's conduct did not satisfy the first clause of § 1605(a)(2) (which it does), jurisdiction would still be proper under the third clause.  The third clause confers jurisdiction where the "'lawsuit is (1) 'based ... upon an act outside the territory of the United States'; (2) that was taken 'in connection with a commercial activity' of [the foreign state] outside this country; and (3) that 'cause[d] a direct effect in the United States.'" *Mortimer*, 615 F.3d at 105-06 (quoting *Weltover*, 504 U.S. at 611 and 28 U.S.C. § 1605(a)(2)).

**1.    Defendant's Acts Outside the Territory of the United States**

Although Defendant's failure to file a Schedule 13D was an omission that occurred in the United States, its "decision not to file 13D [r]eports" was "an act committed in Argentina," as Defendant itself concedes.  Def.'s Mot. at 10.  The specific act at issue here thus occurred both in Argentina and the United States.  Moreover, Repsol's claim is also based on Defendant causing YPF to engage in an IPO in part in Argentina, to issue stock that trades on the Buenos Aires Stock Exchange in Argentina, and to make all related decisions in Argentina as a controlling shareholder (including to keep YPF NYSE-listed).  *See* Compl. ¶ 12; Def.'s Mot. at 10.

**2.    Defendant's Commercial Activity in Argentina**

As noted above in Section I.A.1.b, Defendant's course of conduct was commercial.  In taking a company public, raising capital through securities in Argentina (and the United States), acquiring and holding beneficial majority ownership of a publicly-traded company, and making all related decisions (including purportedly exercising its powers as controlling shareholder to elect a hand-picked Board and to keep YPF NYSE-listed),[11] Argentina acted "in the manner of a

---

phrase "or omissions" in Section 1391(f)(1) is superfluous, because there would never be any U.S. location in which an "omission" by itself could "giv[e] rise to" any "claim" over which a court has jurisdiction.

[11] Repsol does not concede that this purported exercise of authority was proper under YPF's bylaws.

private player within [the market]." *Weltover*, 504 U.S. at 614-15; *see also Schmidt v. Polish People's Republic*, 579 F. Supp. 23, 26 (S.D.N.Y. 1984) ("issuing bonds to raise [] necessary capital" is commercial). Moreover, Argentina's decision not to disclose to investors commercial information required of all 5% beneficial owners was also commercial.

### 3.   Direct Effect in the United States from Defendant's Foreign Commercial Activities

An effect is "direct" "if it follows as an immediate consequence of the defendant's . . . activity." *Weltover*, 504 U.S. at 618 (citations and internal quotation marks omitted). A "direct" effect "flows in a straight line" without intervening causes. *Martin v. Republic of S. Africa*, 836 F.2d 91, 95 (2d Cir. 1987) (citation and internal quotation marks omitted).

Here, as an "immediate consequence" of Defendant's decision, Defendant failed to file a Schedule 13D in the United States, and the SEC filings for YPF ADSs thus became deficient, depriving U.S. (and foreign) investors in YPF securities, and the securities markets and regulators, of material information.[12] There was no "intervening" cause between Argentina's decision and the absence of a required filing in the United States; one flows directly and unavoidably from the other. *See Martin*, 836 F.2d at 95 (direct effect is "one which has no intervening element") (citation and internal quotation marks omitted). There is nothing "speculative," Def.'s Mot. at 12, about this effect.

_____

[12] Defendant's contention that Repsol has not alleged that shareholders of YPF are located in the United States, Def.'s Mot. at 12-13, is both irrelevant and incorrect. The FSIA does not require U.S. plaintiffs, but rather only "a direct effect in the United States." *Mortimer*, 615 F.3d at 105-06; *Weltover*, 504 U.S. at 619 ("We reject Argentina's suggestion that the 'direct effect' requirement cannot be satisfied where the plaintiffs are all foreign corporations . . . ."); *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 489 (1983) (FSIA permits "a foreign plaintiff to sue a foreign sovereign in the courts of the United States, provided the substantive requirements of the Act are satisfied."); *see also Morrison v. Nat'l Australia Bank Ltd.*, 130 S. Ct. 2869, 2888 (2010) (holding that the U.S. securities laws protect transactions occurring on U.S. exchanges, even by non-U.S. purchasers); *Sgalambo v. McKenzie*, 739 F. Supp. 2d 453, 487, 487 n.216 (S.D.N.Y. 2010) (same). In any event, the Complaint asserts the existence of U.S. investors. *See* Compl. ¶ 9.

In fact, the Supreme Court has held that the failure to perform an act required to be performed in the United States—such as breach of a contract to be performed in the United States—"necessarily ha[s] a 'direct effect' in the United States . . . ." *Weltover*, 504 U.S. at 619. Courts have uniformly followed the Supreme Court's reasoning. *See, e.g., Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 241 (2d Cir. 1994) (failure to make contractually-obligated payment in the United States caused direct effect); *Keller v. Cent. Bank of Nigeria*, 277 F.3d 811, 818 (6th Cir. 2002) (same); *Hanil Bank v. PT. Bank Negara Indonesia (Persero)*, 148 F.3d 127, 132 (2d Cir. 1998) (failure to make required payment on a letter of credit in the United States caused direct effect); *Adler v. Fed. Republic of Nigeria*, 107 F.3d 720, 727 (9th Cir. 1997) (failure to perform contract in the United States caused direct effect).

### C.      Congress Has Mandated That Foreign Governments Are Subject To, Not Immune From, Section 13(d)

Moreover, stepping back from Argentina's narrow arguments as to why its actions are not commercial, Congress has already determined that when a foreign government engages in the inherently commercial conduct that triggers Section 13(d), far from being immunized, it is required to make disclosures. Congress wrote Section 13(d) explicitly to apply to foreign governments. *See* 15 U.S.C. § 78m(d)(1) (applying to "any person"); *id.* § 78c(a)(9) (defining a "person" to include a "*government*, or political subdivision, agency, or instrumentality of a government") (emphasis added); *id.* § 78c(c) (creating exception only for the U.S. government). It would make no sense for Congress explicitly to include foreign governments under the Act, including Section 13(d), but then exclude them *sub silentio* via the FSIA. SEC testimony confirms that the U.S. securities laws and Section 13(d) apply to foreign sovereigns. *See* Ethiopis Tafara, *Testimony Concerning the Regulatory Framework for Sovereign Investments Before the Senate Committee on Banking, Housing, and Urban Affairs* (Apr. 24, 2008), *available*

13

*at* http://www.sec.gov/news/testimony/2008/ts0342408et.htm (explaining that "the fact that a fund or business is owned by a foreign government" does not "shield it from liability under U.S. federal securities laws" such as Section 13(d)).[13]

Recognizing this, other foreign governments file Schedule 13Ds upon acquiring beneficial ownership of more than 5% of a class of registered securities.  *See, e.g.,* Schedule 13D filed October 6, 2008 by the Kingdom of Norway, Ministry of Petroleum & Energy.[14]  Likewise, the Government of Venezuela properly filed a Schedule 13D when it amassed shares of an issuer pursuant to a nationalization plan.  *See* Schedule 13D filed February 22, 2007 by the Government of the Bolivarian Republic of Venezuela.[15]  Furthermore, many foreign state-owned oil companies are registered issuers under U.S. securities laws and comply with the corresponding filing requirements.[16]

## II.   THE COURT HAS PERSONAL JURISDICTION BECAUSE THERE IS SUBJECT MATTER JURISDICTION UNDER THE FSIA AND ARGENTINA DOES NOT DISPUTE THAT IT WAS PROPERLY SERVED

Constrained only by constitutional due process considerations, personal jurisdiction under the FSIA "equals subject matter jurisdiction plus valid service of process."  *Shapiro*, 930 F.2d at

---

[13] In his testimony, Mr. Tafara, the Director of the SEC's Office of International Affairs, stated that Section 13(d), among other provisions of the Exchange Act, "make[s] the point that *SEC rules that apply to investors in the U.S. capital market also apply to sovereign wealth funds and sovereign businesses*."  *Id.* (emphasis added).

[14]*Available at* http://www.sec.gov/Archives/edgar/data/1140625/000110465908062297/a08-24870_1sc13d.htm.

[15] *Available at* http://www.sec.gov/Archives/edgar/data/103198/000114036107004049/formsc13d.htm.  Indeed, sovereigns have recognized the applicability of SEC requirements regarding both initial and updated disclosures, and even with respect to amassing shares solely as passive investments.  *See* Schedule 13G/A filed February 14, 2006 by the Republic of Italy, Ministry of Economy and Finance, *available at* http://www.sec.gov/Archives/edgar/data/52782/000134100406000388/lon473093.txt; Schedule 13G filed February 14, 2005 by the State of  São Paolo, *available at* http://www.sec.gov/Archives/edgar/data/1170858/000129281405000137/sbs_formsch13g.htm (noting number of shares beneficially owned by the State of  São Paolo in the Basic Sanitation Company of the State of  São Paolo, and demonstrating that even governmental subdivisions must comply with the Exchange Act provisions governing beneficial owners of securities of U.S.-listed companies).  If the disclosure requirements apply to the merely passive acquisition of stock then *a fortiori* they should apply to the acquisition of stock in a change of control situation.

[16] *See, e.g.,* Petrobras, CIK # 0001119639 (Brazil); Ecopetrol S.A., CIK # 0001444406 (Colombia); Statoil ASA, CIK # 0001140625 (Norway); Total S.A., CIK # 0000879764 (France); ENI SPA, CIK # 0001002242 (Italy).

1020.  Since, as explained above, subject matter jurisdiction is proper under the FSIA, and

Defendant neither disputes that it was properly served nor attempts to argue that it has been

deprived of constitutional due process, there is no basis to question personal jurisdiction.

### III.    THE ACT OF STATE DOCTRINE IS IRRELEVANT BECAUSE REPSOL DOES NOT CHALLENGE THE EXPROPRIATION HERE

Defendant's reliance on the Act of State doctrine fails for four reasons.  *First*, as a

threshold matter, it is premature to consider the Act of State doctrine on a motion to dismiss,

because it is an affirmative defense as to which Defendant bears the burden of persuasion.  *See*

*Daventree*, 349 F. Supp. 2d at 755; *Lyondell-CITGO Ref., LP v. Petroleos de Venez., S.A.*, No.

02 Civ. 0795, 2003 U.S. Dist. LEXIS 13809, at *26 (S.D.N.Y. Aug. 6, 2003).

*Second*, the Act of State doctrine "applies only to actions of a nation within its territory."

*Lightwater Corp. v. Republic of Argentina*, No. 02 Civ. 3804 (TPG), 2003 WL 1878420, at *5

(S.D.N.Y. Apr. 14, 2003).  Although some of Defendant's conduct occurred in Argentina, its

specific failure to file occurred here and thus cannot be protected under the doctrine.

*Third*, this lawsuit does not challenge the validity of any "sovereign" act.  "Act of state

issues only arise when a court must decide – that is, when the *outcome of the case turns upon* –

the effect of official action by a foreign sovereign.  When that question is not in the case, neither

is the act of state doctrine."  *W. S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*, 493 U.S.

400, 406 (1990) (emphasis added).  Here, Repsol's claim does not challenge the validity of

Defendant's decisions or methods in expropriating a controlling block of YPF's stock.  *See*

Compl. ¶ 22.  Instead, Repsol only challenges Defendant's separate failure to file a Schedule

13D.  Thus, a judgment for Repsol would not "declare invalid" any "official act" by Defendant.

*Kirkpatrick*, 493 U.S. at 405.  Because the "outcome of the case" does not "turn[] upon" holding

the expropriation to be proper or improper, the Act of State doctrine is "not in the case."  *Id.*

15

*Fourth*, the Act of State doctrine, like the FSIA, also includes a commercial activity exception.  Actions which are "commercial" rather than "governmental" are not protected by the Act of State defense.  *See United States v. Giffen*, 326 F. Supp. 2d 497, 503 (S.D.N.Y. 2004) (holding that actions which are "commercial—not governmental" are not immune under the Act of State Doctrine).  Therefore, Defendant's Act of State defense also fails because, as explained above, the acts here were commercial in nature.

Defendant also claims that its decision not to file a Schedule 13D was a "sovereign decision" simply because Defendant made the decision, Def.'s Mot. at 15, but this contradicts Congress' inclusion of "governments" in Section 13(d), *see* 15 U.S.C. § 78c(a)(9).  Moreover, if Defendant were correct, Defendant could "decide" to engage in many clearly commercial activities such as making loans, buying and selling goods, or issuing debt, and its "decision" would make all those actions "sovereign."  This tautology, which would protect any sovereign from ever being sued, finds no support in case law.  *See generally Kirkpatrick*, 493 U.S. at 405; *see also Lightwater Corp.*, 2003 WL 1878420, at *5 (finding Act of State doctrine inapplicable where Defendant Argentina failed to make payments on bonds held in the United States).

## IV.    THE COMPLAINT ADEQUATELY STATES A CLAIM FOR THE LIMITED INJUNCTIVE RELIEF SOUGHT BY REPSOL

### A.    Courts Allow Claims for Failure to File a Schedule 13D to Proceed Without Considering the Standards Applicable to a Broader Claim for Injunctive Relief

The sole relief the Complaint seeks is for Defendant to file its statutorily-required disclosures.  When faced with a defendant who has simply failed to file a Schedule 13D without excuse, courts routinely require its issuance without analyzing the requirements for broader injunctive relief—a thoroughly logical approach, as the SEC itself has already determined what disclosures must be made and when.  As courts in this District have noted, "a preliminary

injunction *should ordinarily issue* requiring a corrective disclosure," and a "preliminary injunction should issue where there has been a failure 'to adequately disclose material information' necessary to make the statements contained in a Schedule 13D not misleading." *E.ON AG v. Acciona, S.A.*, 468 F. Supp. 2d 537, 556 (S.D.N.Y. 2006) (emphasis added) (citation omitted).  Likewise, in *Global Intellicom, Inc. v. Thomson Kernaghan & Co.*, the court concluded that the plaintiff had stated a claim for violation of Section 13(d), without analyzing the standards for broader injunctive relief.  No. 99 CIV 342, 1999 WL 544708, at *13 (S.D.N.Y. July 27, 1999).  Here, because Defendant "accumulat[ed] . . . a large percentage of securities" but filed nothing, a filing is required.  *Id.*

        In contrast, the cases Defendant cites involve the completely different situation of requests to *enjoin* shareholders from taking actions, such as acquiring stock, voting stock already in their possession, or violating securities laws in the future.  *See, e.g., Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 57 (1975) (discussing injunctions against voting shares and against future violations of securities laws); *ICN Pharms. v. Khan*, 2 F.3d 484, 488 (2d Cir. 1993) (vacating injunction barring defendant from attempting to replace the issuer's board of directors); *Treadway Cos. v. Care Corp.*, 638 F.2d 357, 374 (2d Cir. 1980) (discussing request for order requiring divestiture of shares or enjoining defendant from voting shares).  Those injunctions are not relief specified in Section 13(d), but rather are judicially-crafted solutions to attempt to preserve the status quo given the harm caused by missing disclosures.  The stricter requirements for these kinds of far-reaching injunctive relief have no bearing on whether this Court can simply instruct Defendant to issue an *admittedly-required* Schedule 13D.[17]

---

[17] Indeed, even where a party *fails* to demonstrate entitlement to far-reaching injunctive relief such as preventing stock purchases, courts *still* refuse to dismiss claims for failure to file a Schedule 13D.  *See Nam Tai Elecs., Inc. v. Tele-Art, Inc.*, No. 93 Civ. 8024, 1994 WL 4438, at *2-3 (S.D.N.Y. Jan. 5,1994) (denying motion to dismiss claim under Section 13(d) because "even in the absence of any immediate plans to control a corporation, an investor must

**B.      Repsol Easily Meets the Requirements for Injunctive Relief**

In any event, Repsol meets the requirements for injunctive relief.  To obtain a permanent injunction, a party must show "the absence of an adequate remedy at law and irreparable harm if the relief is not granted."  *Patsy's Italian Restaurant, Inc. v. Banas*, 658 F.3d 254, 272 (2d Cir. 2011) (citation and quotation marks omitted).  Courts apply these factors flexibly, on a "sliding scale."  *See Citigroup Global Markets, Inc. v. VCG Special Opportunities Master Fund Ltd.*, 598 F.3d 30, 38 n.8 (2d. Cir. 2010) (recognizing that the Supreme Court has applied injunctive relief factors on a sliding scale).  In addition, the relief "should be narrowly tailored to fit specific legal violations."  *Patsy's*, 658 F.3d at 272 (citation and quotation marks omitted).[18]

**1.      There Is No Adequate Legal Remedy**

The only remedy available to a private litigant for a violation of Section 13(d) is the disclosure itself.  *See Drexel*, 837 F. Supp. at 608; *E.ON A.G.*, 468 F. Supp. 2d at 550-51.  Defendant states that Repsol "can pursue compensation" for the expropriated shares elsewhere, Def.'s Mot. at 19, but this is irrelevant, as Repsol here asserts no claim based on the expropriation of its shares, but rather seeks only the disclosure of information required by law and SEC rules.[19]

---

comply with the requirements of Section 13(d)," and denying without prejudice request to direct defendant to file Schedule 13D because "during the pendency of this motion [it] filed an amended Schedule 13D").

[18] Unlike a plaintiff seeking a preliminary injunction, in opposing a motion to dismiss, a plaintiff seeking only a permanent injunction need not demonstrate a likelihood of success on the merits, since the Court must accept all allegations as true.  In any event, here Repsol's claim is overwhelmingly likely to succeed on the merits as Defendant concedes that it intentionally chose to violate Section 13(d).

[19] Moreover, Defendant has publicly repudiated its obligation to compensate Repsol for the expropriated shares.  Shortly after the expropriation announcement in April 2012, an official stated, "We're not going to pay" the compensation Repsol had demanded.  *See* Ex. 6, Louise Armitstead, *Argentinian Minister Axel Kicillof Says Country "Will Not Pay" $10bn Compensation for YPF-Repsol*, THE TELEGRAPH, Apr. 18, 2012, *available at* http://www.telegraph.co.uk/finance/newsbysector/energy/oilandgas/9212300/Argentinian-minister-Axel-Kicillof-says-country-will-not-pay-10bn-compensation-for-YPF-Repsol.html.

2.      **Irreparable Harm**

a.      **Defendant's Failure to Comply with Section 13(d) Injures All YPF Shareholders and Deprives All NYSE Market Participants of Material Information, in Defiance of the Williams Act**

Contrary to Defendant's suggestion that shareholders are not "irreparably harmed" by its failure to disclose the information required in Schedule 13D, this failure in fact continues to harm Repsol and YPF's other shareholders.  First, Congress has already determined that the required information is necessary to investors.  *See* 15 U.S.C. § 78m(d)(1)(A)-(E).[20]  The SEC likewise has determined that to evaluate whether to hold, buy, or sell their shares, investors need information such as the source and amount of funds to be used to consummate the transaction, its purpose, and the existence of any contracts or other understandings with respect to the issuer's securities.  *See* 17 C.F.R. § 240.13d-101, Items 1, 2, 3, 4 and 6.

Second, the particular facts here reinforce these determinations.  Defendant has not disclosed the source and amount of funds to be used in completing the expropriation, whether it plans to allow dividends and if so at what level, whether it will expropriate further shares, whether it will sell interests of YPF to other countries and investors that Repsol may or may not want to be associated with, or what other Argentine sovereign-affiliated entities may have ownership interests or agreements with Defendant that could affect YPF going forward.  Repsol

---

[20] *See also* Ex. 7, *Full Disclosure of Corporate Equity Ownership and in Corporate Takeover Bids: Hearing Before the Subcommittee on Securities of the Senate Committee on Banking and Currency*, 90th Cong., 1st Sess. 2-3 (1967) (statement of Sen. Williams, Chairman, Senate Subcomm. on Securities) (Senator Williams opened the hearings on the legislation by stating that filling the large gap in the disclosure requirements of the securities laws, a step already taken at that point by several other countries, would ensure that "[a]ll will be able to deal in the securities markets knowing that all of the pertinent facts are available.  This is the premise under which our securities markets are supposed to work. Following this premise they have thrived and prospered over the years. Now is the time to eliminate the last remaining areas where full disclosure is necessary but not yet available."); *Turner Broadcasting Sys., Inc. v. F.C.C.*, 520 U.S. 180, 195 (1997) ("We owe Congress' findings deference in part because the institution is far better equipped than the judiciary to amass and evaluate the vast amounts of data bearing upon legislative questions.") (citation and internal quotation marks omitted).

and the other YPF shareholders need this information to evaluate what to do with their shares,

including whether to hold or sell, and how to exercise voting rights regarding directors and any

other issues.[21]  Lacking this information more than satisfies any requirement for a showing of

harm.  *Cf. Bender v. Jordan*, 439 F. Supp. 2d 139, 177 (D. D.C. 2006) ("'The threat of an

uninformed stockholder vote constitutes irreparable harm.'") (quoting *ODS Techs., LP v.*

*Marshall*, 832 A.2d 1254, 1262 (Del. Ch. 2003)).

> **b.   Defendant's Seizure of Control Before Completing the**
> **Expropriation and Without Making a Required Tender Offer**
> **Does Not Excuse Its Schedule 13D Filing Requirement**

Defendant argues that its gamesmanship in completing a takeover of the controlling

interest in YPF prior to filing any disclosure renders its statutory obligations moot.  However,

Section 13(d) precludes this argument; it contains no exception for majority owners, or for

owners whose plans are allegedly complete.  Instead, it commands that "*any person*" who

acquires "*beneficial ownership*" of 5% or more of a class of registered securities "shall" file the

required disclosure within 10 days, *see* 15 U.S.C. § 78m(d)(1) (emphasis added), and thereafter

continuously amend such filing should there arise any material changes in the information

disclosed.  *See* 15 U.S.C. § 78m(d)(2); *see also* 17 C.F.R. § 240.13d-2(a); *GAF Corp. v. Milstein,*

453 F.2d 709, 720 (2d Cir. 1971).  Unsurprisingly, other sovereigns do not share Argentina's

---

[21] For example, Defendant and the Argentine provinces may have acted or be acting as a "group" that must be disclosed under Section 13(3).  *See* 15 U.S.C. § 78m(d)(3) ("When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a 'person' for the purposes of this subsection.").  Here, there appears to be some type of partially-disclosed understanding that some shares will be transferred to the provinces, with some attendant arrangement regarding voting control, but the details have not been fully publicly-disclosed, much less in a Schedule 13D.  *See* Ex. 8, *Santa Cruz Extended YPF Concessions*, CLARÍN, Nov. 8, 2012, *available at* http://www.ieco.clarin.com/economia/Santa-Cruz-prorrogo-concesiones-YPF_0_806919537.html (noting the existence of an agreement signed in November 2012 between the Argentine federal government and the Province of Santa Cruz to transfer 5.5% of the shares of YPF to the province).  Acquisition by the Province of Santa Cruz of more than 5% beneficial ownership of YPF stock would, of course, trigger its own disclosure obligations.  This is precisely the type of arrangement that Section 13(d) requires disclosure of and of which investors need to be informed, including information such as the terms of the agreement and when it might expire or change.

view that Section 13(d) does not apply to majority shareholders.  *See* Schedule 13D filed October 6, 2008 by the Kingdom of Norway, Ministry of Petroleum & Energy (disclosing ownership of 64.7% of outstanding shares, and intention to acquire up to 67% over time).

Moreover, if Defendant's argument were correct, it would eviscerate Section 13(d).  Any party could take control, flout the requirements of the Exchange Act, then justify its failure to notify shareholders of its intentions by telling them, in effect, "too late."  No case permits such a result, and in fact courts do not excuse a party subject to Section 13(d) from completing the required filing simply because a contest for control is over.  *See, e.g.*, *GAF Corp.*, 453 F.2d at 714 (concluding that plaintiff stated a claim under Section 13(d) even though management had *already* prevailed in the proxy contest initiated by the defendants).

Defendant also implies that the lack of a pending tender offer eliminates any need for the Schedule 13D, but the language of Section 13(d) contradicts this argument as well. Section 13(d) is triggered not upon a tender offer, but any time a person "acquir[es] directly or indirectly the beneficial ownership" of 5% or more of a class of securities.  15 U.S.C. § 78m(d)(1).  Likewise, none of the cases cited by Defendant excuses a party from ever filing a Schedule 13D because there was not a pending tender offer.  Instead, each of those cases states, or presumes, that the beneficial owner *must* file and/or amend a Schedule 13D.[22]  Indeed, Defendant's purported seizure of a majority of YPF's stock—especially in conjunction with its apparent distribution of nearly half of those shares to certain Argentine States, but retention of voting power—implicates the core purpose of the Williams Act, which is to assure "full

---

[22] *See Rondeau*, 422 U.S. at 59 (noting that the defendant "has now filed a proper Schedule 13D"); *ICN Pharms.*, 2 F.3d at 489 (explaining a preference for "corrective" injunctions preventing a shareholder from taking control of a company only until "*a corrective filing is made*" (emphasis added)); *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 120 (2d Cir. 2001) (noting that the defendants had filed a Schedule 13D reporting the acquisition of more than 10% of an issuer's stock); *Treadway Cos.*, 638 F.2d at 380 (noting the defendant "*filed another amendment to its Schedule 13D*, disclosing unequivocally that it had determined to seek control of" the issuer (emphasis added)).

disclosure in connection with cash tender offers and *other techniques for accumulating large blocks of equity securities* of publicly held companies." S. Rep. No. 90-550 at 4 (1967); H.R. Rep. No. 90-1711, at 4 (1968) (*reprinted in* 1988 U.S.C.C.A.N. 2811, 2814) (emphasis added).

Finally, it is ironic that Defendant attempts to excuse its violation of the securities laws on the ground that there is no pending tender offer for shareholders to evaluate, when in fact YPF's bylaws require Argentina to make just such a tender offer to the remaining shareholders. *See* Ex. 1, Bylaws Compl.  If it had complied with this bylaw requirement, even Argentina would concede that the Schedule 13D would be critical to investors.  Once again, Defendant is attempting to use one violation of its legal requirements as an excuse for yet another violation.[23]

**c.     YPF's Disclosures as an SEC-Reporting Company Do Not Excuse Defendant's Non-Compliance with Its Own Disclosure and Filing Requirements as a Shareholder**

Nor do *YPF's* disclosures satisfy *Defendant's* (or any "group" members') separate duty to provide all the information called for in a Schedule 13D.  *See* Def.'s Mot. at 18-19.  YPF's description of the Argentine expropriation law, and of *YPF's* management and strategic plans, fail to provide all the information required on Schedule 13D related to the background, terms, circumstances, and plans related to *Argentina's* beneficial ownership of Repsol's YPF shares. *See* 17 C.F.R. § 240.13d-101, Items 1, 2, 3, 4 and 5.[24]

Moreover, courts reject the type of "mootness" argument Defendant makes here where, as in this case, it is not yet clear whether those other disclosures provide sufficiently accurate and complete information.  *See E.ON AG*, 468 F. Supp. 2d at 555 (declining to dismiss Section 13(d)

---

[23] Moreover, because Repsol expects that Argentina will be required to make this tender, this information remains relevant even under Defendant's cramped interpretation of Section 13(d).  *See* Ex. 1, Bylaws Compl.

[24] The same goes for public announcements by Defendant in Argentina.  Even if government officials had publicly described to the press all of the information called for in Schedule 13D (which they have not), that would not excuse Defendant's duty to file this information with the SEC, so as to be accessible to all investors.

22

claim where sufficiency of curative disclosures was unclear).  At the motion to dismiss stage, the

Court should not presume the truth of Defendant's factual assertion that YPF's filings include all

the material information required in Defendant's Schedule 13D—since no one other than

Defendant knows what facts it would have disclosed.  *See Bayerische*, 692 F.3d at 51-52.  In

fact, Defendant's plans are apparently neither complete nor fully disclosed.  The final transfer of

title to the shares is pending, and Defendant concedes that it has additional, undisclosed plans

with respect to YPF that it wishes to keep secret.  *See* Defendant's Mot. at 15-16 (arguing that

Argentina's "plans [with respect to] its national oil and gas industry, including such sensitive

decisions as investments and asset sales" should not be disclosed).

Furthermore, a Schedule 13D filer must promptly amend such filing should any relevant

information change.  *See* 15 U.S.C. § 78m(d)(2); 17 C.F.R. § 240.13d-2(a).  Thus, Defendant has

been under a continuing duty since May 2012 not just to disclose its plans for YPF, but to update

its disclosures when plans change.

### 3.    The "Sliding Scale" Overwhelmingly Favors Requiring Defendant's Compliance with Section 13(d)

The "sliding scale" approach governing requests for injunctive relief, *Citigroup*, 598 F.3d

at 38 n.8, overwhelmingly favors requiring compliance with Section 13(d).  Here, the harm to

shareholders and other market participants from being deprived of information critical to making

real-time investment and future voting decisions more than justifies the limited, narrowly-

tailored relief of requiring Argentina to comply with Section 13(d).  *See Patsy's*, 658 F.3d at 272,

274 (affirming grant of narrow injunctive relief).  This is especially true given that Defendant

does not dispute that these disclosures are required, nor does it provide any reason why the

disclosures would harm it in any way.  Moreover, unlike in cases where courts have denied broad

injunctions, here Defendant has not demonstrated good faith by rectifying its past Section 13(d)

violations.  *See, e.g., Rondeau*, 422 U.S. at 61-62 (noting that petitioner had "promptly filed a

Schedule 13D when his attention was called to this obligation"); *Treadway Cos.*, 638 F.2d at 380

(finding that subsequent amendment to a previously-filed Schedule 13D "cured any deficiencies

in the earlier filings").  Instead, given Defendant's admitted bad faith in intentionally violating its

disclosure requirements, there is no reason effectively to grant Argentina the extraordinary relief

of excusing its compliance with U.S. law.

## V.      VENUE IS PROPER

Under the FSIA, venue is proper "in any judicial district in which a substantial part of the

events or omissions giving rise to the claim occurred."  28 U.S.C. § 1391(f)(1).  "Substantial"

does not mean all or even most.  Indeed, under the FSIA's venue provision, venue may be

appropriate in a district "even if a greater portion of events occurred elsewhere."  *Concesionaria*

*DHM, S.A. v. Int'l Fin. Corp.*, 307 F. Supp. 2d 553, 559 (S.D.N.Y. 2004).  Accordingly, where

courts find events in the district supporting the commercial activity exception to the FSIA, the

test for venue is easily satisfied.  *See Am. Const. Mach.& Equip. Corp. v. Mechanised Constr. of*

*Pakistan Ltd.*, No. 85 Civ. 376, 1986 WL 2973, at *5 (S.D.N.Y. Mar. 5, 1986).

Here, more than a "substantial" portion of the events giving rise to the claim occurred in

the Southern District of New York.  When Argentina took YPF public through an SEC-

registered IPO, YPF ADSs were listed and offered on the NYSE.  *See* Compl. ¶ 12.  Argentina

therefore offered, caused to be registered, and marketed NYSE-traded securities in this district,

raising more than $1 billion of capital in the process.  *Id.*  Then, when Argentina acquired

beneficial ownership of 51% of YPF's stock, including voting rights, it necessarily took control

of shares traded as ADSs on the NYSE, given that ADSs make up 60% of the outstanding shares.

*See id.*  These activities resulted in Argentina's breached obligation to file a Schedule 13D.  And more recently, Defendant has even engaged in a "road show" in New York.

Moreover, courts frequently find venue proper in the district where an "omission" occurred.  28 U.S.C. § 1391(f)(1); *see Tonoga, Ltd. v. Ministry of Public Works & Housing of the Kingdom of Saudi Arabia*, 135 F. Supp. 2d 350, 359 (N.D.N.Y. 2001) (finding venue and jurisdiction proper where "a substantial portion of the alleged guarantee was to be performed in this district"); *Am. Const. Mach. & Equip. Corp.*,  1986 WL 2973, at *5 (finding venue proper in part based on the place of performance of an unfulfilled contractual obligation).  Here, although the literal place of filing for the 13D would have been in Washington, D.C., by failing to file, Argentina also simultaneously failed to provide material information to securities market participants in the NYSE.  Argentina's failure to file thus constituted an omission in this district, further supporting proper venue before this Court.[25]

## CONCLUSION

Plaintiff respectfully requests that the Court deny Defendant's Motion to Dismiss.

---

[25] Given that the factors explained above support venue in this District, *a fortiori* Repsol's choice of venue does not reflect any "lack of diligence" that would require dismissal on grounds that Repsol had no reasonable belief venue could be proper.  *Cf.* Def.'s Mot. at 23.

Dated:  February 15, 2013
 New York, NY

Respectfully submitted,

LATHAM & WATKINS LLP

By:/s/ Christopher R. Harris
    Miles N. Ruthberg
    James E. Brandt
    Christopher R. Harris
    885 Third Avenue
    New York, New York 10022
    United States of America
    Telephone: (212) 906-1200
    Facsimile: (212) 751-4864

    *Counsel for Plaintiff*