UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------- X


REPSOL YPF, S.A.[i],                                      :

                                  Plaintiff,             :    12 Civ. 4018 (TPG)

                    - against -                          :    **DECLARATION OF CHRISTOPHER**
                                                              **HARRIS IN OPPOSITION TO**
THE REPUBLIC OF ARGENTINA,                               :    **DEFENDANT'S MOTION TO DISMISS**
                                                              **THE COMPLAINT**
                                  Defendant.             :

-------------------------------------------------------- X


         I, Christopher R. Harris, do hereby declare under the penalty of perjury pursuant to 28

U.S.C. § 1746, as follows:

         1.       I am a member of the Bar of this court and a partner at the firm of Latham &

Watkins LLP, 885 Third Avenue, New York, New York 10022, counsel for Plaintiff Repsol

YPF, S.A., now known as Repsol, S.A.  I respectfully submit this declaration in opposition to

Defendant's Motion to Dismiss the Complaint in the above-captioned proceedings.

         2.       Attached hereto as Exhibit 1 is a true and correct copy of the Complaint in *Repsol*

*YPF, S.A. v. Republic of Argentina*, Civ. Action No. 12-3877 (TPG), filed on May 15, 2012

("ByLaws Complaint") (ECF No. 1).

         3.       Attached hereto as Exhibit 2 is a true and correct copy of the Complaint filed on

May 21, 2012 in the above-captioned proceedings, *Repsol YPF, S.A. v. Republic of Argentina*, 12

Civ. 4018 (TPG) (ECF No. 1).

---

[i] Now known as Repsol, S.A.

4.      Attached hereto as Exhibit 3 is a true and correct copy of the article, Victoria Ginzberg, *"We Will Take the Necessary Measures,"* PÁGINA 12, June 16, 2012, *available at* http://www.pagina12.com.ar/diario/elpais/1-196541-2012-06-16.html, with an attached English translation and certification of translation.

5.       Attached hereto as Exhibit 4 is a true and correct copy of the article, *State-Controlled YPF Wants to Keep Its ADS Listed in the New York Exchange*, MERCOPRESS, May 16, 2012, *available at* http://en.mercopress.com/2012/05/16/state-controlled-ypf-wants-to-keep-its-ads-listed-in-the-new-york-exchange.

6.      Attached hereto as Exhibit 5 is a true and correct copy of the article, *Fernandez Meets in New York with the CEO of Exxon Mobil*, FINANZAS, Sept. 28, 2012, *available at* http://www.finanzas.com/noticias/economia/20120928/fernandez-reune-nueva-york-1550479.html, with an attached English translation and certification of translation.

7.      Attached hereto as Exhibit 6 is a true and correct copy of the article, Louise Armitstead, *Argentinian Minister Axel Kicillof Says Country "Will Not Pay" $10bn Compensation for YPF-Repsol,* THE TELEGRAPH, Apr. 18, 2012, *available at* http://www.telegraph.co.uk/finance/newsbysector/energy/oilandgas/9212300/Argentinian-minister-Axel-Kicillof-says-country-will-not-pay-10bn-compensation-for-YPF-Repsol.html.

8.      Attached hereto as Exhibit 7 is a true and correct copy of the Congressional testimony titled, *Full Disclosure of Corporate Equity Ownership and in Corporate Takeover Bids: Hearing Before the Subcommittee on Securities of the Senate Committee on Banking and Currency*, 90th Cong., 1st Sess. 2-3 (1967).

9.      Attached hereto as Exhibit 8 is a true and correct copy of the article, *Santa Cruz Extended YPF Concessions*, CLARÍN, Nov. 8, 2012, *available at*

2

http://www.ieco.clarin.com/economia/Santa-Cruz-prorrogo-concesiones-

YPF_0_806919537.html, with attached English translation and certification of translation.

       10.     I declare under penalty of perjury that the foregoing is true and correct.


Dated:  February 15, 2013
        New York, New York


                By: /s/ Christopher R. Harris
                   Christopher R. Harris

# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------ x

REPSOL YPF, S.A. and TEXAS YALE
CAPITAL CORP., Individually and On Behalf
of All Others Similarly Situated,

                    **Plaintiffs,**

        - against -

REPUBLIC OF ARGENTINA,

                    **Defendant.**

------------------------------------ x

JUDGE GRIESA

12 CV 3877

Civil Action No. _____

**CLASS ACTION**
**COMPLAINT**

RECEIVED
MAY 16 2012
U.S.D.C. S.D.N.Y.
CASHIERS

      Plaintiffs Repsol YPF, S.A. ("Repsol") and Texas Yale Capital Corp. ("Yale

Capital"), by their attorneys Davis Polk & Wardwell LLP, allege as follows for their

complaint herein:

## NATURE OF THE ACTION

      1.     This class action arises from an effort by the Republic of Argentina

("Argentina") to walk away from the contractual obligations that it undertook when it

chose to enter the United States to raise capital through the initial public offering of its

formerly state-owned oil company, YPF, S.A. ("YPF" or the "Company"). To induce

investors to purchase shares in that former state enterprise, Argentina undertook the

contractual obligation to launch a tender offer to all holders of Class D shares of YPF if it

should ever in the future seek to retake control of the Company. But now, culminating a

wide-ranging offensive against YPF that has nearly halved the stock market value of the

Company in a matter of months, Argentina has seized control of YPF's operations,

appointed an "intervenor" conferred with all the powers of the Company's board and

president, and enacted legislation seizing by fiat a majority of YPF's shares, all without launching any tender offer.

2.      Argentina's tender offer obligation was set forth, *inter alia*, in new provisions of the Company's by-laws that Argentina adopted when, as sole and controlling shareholder, it sought to privatize YPF and to monetize a portion of its interest by publicly offering its shares. The lion's share of that privatization was accomplished through an SEC-registered initial public offering of American Depositary Receipts ("ADRs") listed on the New York Stock Exchange ("NYSE"), which alone delivered proceeds of more than *$1.1 billion* directly to Argentina as selling shareholder – nearly half of the funds raised through the privatization as a whole, and almost twice the proceeds raised within Argentina. In order to induce U.S. and other investors to purchase shares in the formerly state-owned enterprise, Argentina committed to shareholders that it would not retake control of the Company without offering all investors a compensated exit. Indeed, the new provisions prohibited Argentina from ever again exercising control over YPF, even if it had sufficient shares to do so, unless it launched a tender offer for all Class D shares – the shares it was taking public – at a price determined according to those provisions. These promises have been repeated in numerous prospectuses and periodic reports filed with the SEC in the years since the IPO, each of which Argentina approved and ratified in its commercial capacities as a shareholder of YPF and through its designated board representative.

3.      Notwithstanding these clear contractual commitments, and without any tender offer being launched, Argentina has now seized control of YPF's facilities and operations, appointed an intervenor with total control over the Company, and enacted

legislation seizing by fiat a majority of the Company's shares. Argentina's failure to launch a tender offer despite having retaken control over YPF constitutes a breach of its contractual obligations to other shareholders. Its unequivocally expressed intention to acquire a majority of the Company's shares without any such tender offer moreover constitutes a repudiation of its contractual obligations and presents an actual, justiciable controversy concerning the parties' rights and obligations under their contract.

4.      Plaintiffs accordingly seek compensatory damages in respect of Argentina's breach of contract, a declaration from this Court upholding Plaintiffs' legal rights under the contract, and other relief as set forth herein. Plaintiffs' claims do not require any ruling on the sovereign powers of Argentina. Rather, it is the contractual consequences of Argentina's actions, actions constituting the commercial conduct of Argentina in its capacities as selling and continuing shareholder of YPF, and relating to commercial acts due to have been performed in this District – that are at issue. These issues are commercial matters within the jurisdiction of this Court and are specifically governed by an enforceable contract among the parties.

**PARTIES**

5.      Plaintiff Repsol is a publicly-held limited liability company (*sociedad anónima*) organized under the laws of the Kingdom of Spain with its headquarters in Madrid, Spain. Plaintiff Repsol is a holder of YPF Class D shares directly and through its ownership of ADRs administered by the Bank of New York as depositary agent. Through a series of transactions in 1999, including a direct purchase from Argentina consummated in New York City and a public tender offer for Class D shares, Repsol acquired a controlling stake in YPF and remains one of YPF's largest shareholders. It is from Repsol that Argentina has subjected to expropriation 51% of YPF's Class D shares.

3

In this action Repsol is suing solely on the basis of its continued holding of that portion of its shares that is not subject to the expropriation process.

6.      Plaintiff Texas Yale Capital Corp. is a financial investment advisory firm registered with the SEC and organized under the laws of the State of Texas with its headquarters located in Spicewood, Texas.  Yale Capital holds shares in YPF through its ownership of ADRs administered by the Bank of New York as depositary agent.

7.      Defendant the Republic of Argentina is also a shareholder of YPF.  Prior to the 1993 IPO of YPF, Argentina was the sole owner of YPF, and it participated in that offering, including the SEC-registered offering of ADRs, as the Company's sole and selling shareholder.  Subsequent to the IPO, Argentina has remained a shareholder of the Company, specifically as the exclusive holder of Class A "golden" shares, and has continued to participate in its management through a designated representative on the Company's board of directors.  Argentina has now also acquired control of a majority of the Company's Class D shares through the intervention in YPF and the expropriation of 51% of YPF's Class D shares.  Argentina is organized as a federation of twenty-three provinces and an independent federal city (Buenos Aires).

8.      Non-party YPF is a publicly-held limited liability stock company (*sociedad anónima*) organized under the laws of Argentina.  The address of its principal executive offices is Macacha Güemes 515, 1106, Buenos Aires, Argentina.  Prior to 1993, it was an exclusively state-owned, monopolist oil and gas company.  In the early 1990s, YPF was privatized and Argentina took it public in 1993.  YPF's shares trade on the NYSE, in the form of ADRs, under the symbol "YPF."  YPF's Class D shares comprise almost 100% of the Company's outstanding capital stock.  ADRs represent

4

approximately 60% of YPF's outstanding Class D shares, and thus approximately 60% of

YPF's capital stock.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. § 1330 because this is a non-jury civil action against a foreign state, as

defined in 28 U.S.C. § 1603(a), involving claims for relief *in personam* with respect to

which the foreign state is not entitled to immunity under 28 U.S.C. § 1605(a), or under

any applicable international agreement.  In particular, Defendant Argentina is not entitled

to immunity under 28 U.S.C. § 1605(a)(2) because this action is based upon Argentina's

commercial activity and its acts in connection therewith, which have been carried on and

performed and have caused direct effects in the United States.

10.     Venue in the Southern District of New York is proper pursuant to 28

U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the

claims alleged occurred in this District.

## FACTUAL ALLEGATIONS

### Privatization of YPF and Adoption of the Tender Offer Requirements

11.     From the 1920s through the 1980s, Argentina maintained a monopoly in

the oil and gas industry through state agencies and YPF's predecessor entity,

Yacimientos Petrolíferos Fiscales.  YPF was an entirely state-owned and state-run

enterprise, dominated and controlled by Argentina as its sole shareholder.  Argentina

actively participated in and exercised control over YPF's operations.  As disclosed in

YPF's Prospectus dated June 28, 1993 (the "U.S. IPO Prospectus"), Argentina operated

YPF in accordance with the national hydrocarbon policy and other governmental policies.

These policies "generally reflected broader Argentine political and social objectives

5

rather than business strategies designed to maximize [YPF's] profitability." As an instrument of Argentina, YPF functioned as its agent and representative.

12.     However, in the early 1990s, Argentina made a decision to privatize YPF, representing to potential investors that the Company would be "transform[ed]" from an inefficient government monopoly "into an efficient and competitive enterprise." Acting in a commercial capacity and no different than any private controlling shareholder, Argentina sought to monetize a portion of its interest in YPF by publicly offering shares.

13.     In the context of this privatization and with an eye to an eventual public offering of YPF, Argentina in its commercial capacity as sole and controlling shareholder adopted certain provisions in YPF's by-laws designed to induce investors to purchase the Company's shares by committing to investors that they would be provided a compensated exit in the event Argentina were to have a change of heart and choose to retake control of YPF. Argentina enacted those provisions itself by National Executive Decree No. 1,106, dated May 31, 1993.

14.     In its commercial capacity as shareholder of YPF, Argentina caused those new provisions to be codified in the Company's by-laws. Section 7 of those by-laws required persons intending to consummate a control acquisition to first make a public tender offer for YPF's outstanding shares. And, critically, Section 28 of the by-laws expressly provided that the tender offer requirement of Section 7 applied to any subsequent acquisition of control by Argentina. This was because the purpose of the new tender offer provisions was to address investors' concern that if Argentina should change its mind about privatizing the formerly state-owned oil Company, investors could wind up holding equity in a government-dominated YPF, operated not for their benefit as

6

shareholders, but as an instrumentality of the Argentine government. That is precisely what has now happened, but Argentina has not honored its tender offer obligations and, to the contrary, has made clear that it does not intend to do so.

15.     Sections 7 and 28 of the by-laws remain in effect to date and have been in effect continuously since 1993. Indeed, Section 7 was triggered and honored in the case of two prior acquisitions. Under Section 7, unless a tender offer is launched for all outstanding shares of all classes, it is forbidden for anyone to acquire shares or securities of YPF, whether directly or indirectly, by any means or instrument if, as a result, the acquirer will hold or exercise control over 20% or more of YPF's Class D shares or Class D shares representing 15% or more of YPF's capital stock.

16.     Far from exempting Argentina from those tender offer requirements, another new provision, Section 28, was added to avoid any doubt that Argentina itself was undertaking a tender offer obligation. Indeed, Section 28 was addressed specifically to control transactions by Argentina, setting forth *"Normas especiales"* – "Special provisions" – that made such transactions subject to Section 7 and required Argentina to make a tender offer for all outstanding Class D shares as a condition of acquiring directly or indirectly, by any means or instrument, YPF's shares or securities if, as a result, Argentina were to own or exercise control over (i) at least 49% of YPF's capital stock; (ii) Class D shares representing 15% or more of YPF's capital stock; or (iii) 20% or more of YPF's Class D shares.

17.     Underscoring Argentina's self-imposed prohibition on a reacquisition of control without a tender offer, Section 28 expressly prohibits Argentina from exercising control over the Company – even if it had sufficient shares to do so – unless and until a

tender offer had been made. Absent a tender offer, any shares of stock or securities acquired by Argentina in violation of its contractual tender offer obligation are automatically stripped of any right to vote, to collect dividends or other distributions, or even to be counted towards a quorum of shareholders.

18.     The by-laws not only mandate that Argentina make a tender offer, but also specify the procedures that the tender offer must follow and the price at which the offer must be made. That price is the <u>highest</u> of: (i) the highest price Argentina paid for Class D shares in the preceding two-year period; (ii) the highest closing price, at the seller's rate, for a Class D share of stock, as quoted on the Buenos Aires Stock Exchange, for the preceding thirty-day period; (iii) the product of the highest closing price on the Buenos Aires Stock Exchange in the preceding thirty-day period and the ratio of the highest price Argentina paid for a Class D share in the preceding two-year period against the market price of a Class D share on the day immediately prior to the first day of that two-year period; or (iv) the product of YPF's net income per Class D share during the immediately preceding four complete fiscal quarters and the higher of either the price/income ratio for those four quarters or the highest price/income ratio over the preceding two-year period.

19.     The by-law provisions adopted by Argentina also mandated that the required tender offer be made in the United States – specifically, in New York City. Under Section 7, the tender offeror must publish a notice of the offer at least once a week for the duration of the offer in the business section of the major newspapers of New York. The notice must set forth, *inter alia*, the identification of the bidder, the tender offer price, and a statement that the offer is open to all of YPF's shareholders.

20.     Section 7 also requires that the tender offer must comply with applicable regulations in the jurisdictions where the tender offer takes place and the provisions of the stock exchanges where YPF's shares are listed.  The tender offer mandated by Section 7 therefore must comply with the applicable rules and regulations of the SEC and the New York Stock Exchange.  Those rules and regulations, incorporated by reference into the tender offer provisions, in turn require Argentina to file a tender offer statement in the United States with the SEC, for the benefit of U.S. investors, provide notice to investors and to the New York Stock Exchange, and establish a depository or forwarding agent in New York.

## Initial Public Offering of YPF

21.     On June 29, 1993, acting in its commercial capacity as sole and selling shareholder, Argentina launched an initial public offering of YPF's Class D shares. These shares were offered on the Buenos Aires Stock Exchange and were offered on the New York Stock Exchange and on other exchanges outside the United States and Argentina in the form of ADRs.  But the single largest portion of the public offering was Argentina's sale of shares into the United States, which represented 65,000,000 of the total 140,000,000 Class D shares offered in the privatization.  Indeed, the U.S. offering raised nearly twice as much capital as the Argentine offering, and constituted nearly half of the privatization.  The proceeds to Argentina, as selling shareholder, from the U.S. offering alone were over *$1.1 billion*.  That offering was registered through a Registration Statement on Form F-1 filed with the SEC in accordance with the Securities Act of 1933 and was effectuated by means of the U.S. IPO Prospectus.

22.     The offering was pitched to investors as part and parcel with YPF's "transformation from a *politically managed, government-owned monopoly* to an

*efficient and competitive integrated oil company.*" Now with its intervenor and expropriation law, Argentina is transforming the Company right back to a politically managed, government-controlled company. In marketing its Company to U.S. investors, Argentina distinguished in its U.S. IPO Prospectus the past management of YPF, in which government policies "dictated the management and operation of [YPF]" based on "broader Argentine political and social objectives rather than business strategies designed to maximize [YPF's] profitability." And Argentina painted a cautionary picture of YPF under its past political management: "[YPF's] *operations were inefficient,* and generally *lacked continuity in planning and effective internal controls. Stringent financial criteria were not applied* in making investment decisions, and [YPF]'s opportunities to reinvest internally generated funds were subject to government budgetary constraints." It is thus small wonder, in such circumstances, that investors insisted on a compensated exit should Argentina once again obtain control of YPF, and again run YPF according to its own policies, rather than shareholder interest.

23.     For that reason, Argentina repeated in the U.S. IPO Prospectus its commitment not to reacquire or even exercise control over YPF in the future without launching a tender offer for all of the Class D shares it was taking public. Argentina told potential investors that "*[u]nder the Company's By-laws, in order to acquire a majority of the Company's capital stock or a majority of the Class D Shares, the Argentine Government first would be required to make a cash tender offer to all holders of Class D Shares on terms and conditions specified in the By-laws.*" Argentina also committed in that Prospectus that "*[a]ny Control Acquisition carried out by the Argentine Government other than in accordance with th[at] procedure . . . will result in the*

10

*suspension of the voting, dividend and other distribution rights of the shares so*

*acquired.*" The value of Argentina's promise that it would not retake control of YPF

without offering all Class D shareholders a compensated exit was priced into the value of

Class D shares when they were offered in 1993 and at all times thereafter.

<u>**Argentina's Continued Role as Shareholder of YPF and
Repetitions of Its Tender Offer Obligations**</u>

24.     The privatization and public offering of YPF did not end Argentina's role

as YPF shareholder. To the contrary, the privatization transaction left Argentina with

important privileges and a significant continuing role in YPF.

25.     Argentina remained the exclusive holder of YPF's Class A "golden"

shares, holding 3,764 such shares as of December 31, 2011. Pursuant to the by-laws, as

the holder of Class A shares, Argentina voted separately with respect to the election of

YPF's board of directors and, as long as it held a single Class A share, Argentina was

entitled to appoint one director and one alternate director. In addition, Argentina enjoyed

veto rights with respect to specific categories of corporate activities, including acquisition

by a third party of shares representing more than 50% of YPF's capital stock.

26.     Argentina's commitment, in its capacity as a shareholder of YPF, not to

retake control of the Company without launching a tender offer has been repeatedly

reiterated and reaffirmed to investors in the United States through various means. In

addition to their inclusion in the U.S. IPO Prospectus, English versions of the by-laws

have been regularly filed with or incorporated by reference in the Form 20-F that YPF

files with the SEC on an annual basis. Indeed, so fundamental are the tender offer

provisions to which Argentina is subject that they have been described in each of YPF's

annual Form 20-Fs filed with the SEC since the 1993 IPO. As the holder of YPF's Class

11

A "golden" shares and through its representative on the Company's board of directors, Argentina made and approved each and every one of those continuing promises and continuously ratified its tender offer obligations under YPF's by-laws.

## Argentina's Campaign to Depress the Company's Stock Price

27.     Through the end of 2011, the Argentine government seemed wholly supportive of YPF. Indeed, the government publicly praised YPF, thanking it for its commitment to Argentina and "continuing its investments in the country and being its first taxpayer."[1] In 2010, President Kirchner praised YPF's strategic plan for 2010 through 2014 as "reaffirm[ing] above all things optimism and hopes in the present and the future." As recently as November 2011, the government's board representative stated that "Argentina is in total accord with the activities that the company has been conducting." Indeed, investment banking analysts attending presentations in Argentina in November and December 2011 involving YPF management and high-ranking government officials reported to their clients that the Company's relationship with the government seemed positive, and that the Company was engaged in ongoing discussions with the government to raise domestic gas prices, which the government recognized would be important in order to create a more attractive investment environment.

28.     But beginning no later than January 2012 and through mid-April 2012, Argentina changed course and launched an aggressive and wide-ranging offensive against YPF and its shareholders. As a direct and intended consequence of this government campaign, the stock market value of the Company and the price of its shares were cut nearly in half in a matter of months, in advance of Argentina's seizure of control of YPF

---

[1] All quotations in Paragraphs 27 through 38 are translated from the original Spanish.

12

and announcement of the expropriation legislation on April 16, 2012.  Indeed, public officials acknowledged this objective and celebrated the alleged benefits to Argentina, at the expense of the Company's other shareholders.  For example, on March 14, 2012, Chubut Province Governor Martín Buzzi, speaking on Argentine television, ardently vowed that the decline in YPF's stock price would continue:  "You have seen more than once in recent days that the newspapers report how YPF's stock price has been falling.  Well, those shares are going to keep dropping on the Buenos Aires stock exchange, the Madrid stock exchange and the New York Stock Exchange.  But that is because our shares are going up.  The shares of the Patagonian people are going up.  The shares of the people of Chubut and Santa Cruz are going up, and those are the shares that are important to us."

29.    Argentina's campaign against YPF was characterized by, among other things, repeated government leaks to the Argentine press.  Again and again, a steady stream of unattributed government leaks led to rampant rumors that nationalization and any manner of other hostile government action were imminent.  The effect on YPF's stock of these leaks and the resulting uncertainty was disastrous.

30.    In late January 2012, the Argentine newspaper *Página/12*, which is widely regarded to be a mouthpiece for the Kirchner administration, began reporting that Argentina was considering nationalizing YPF.  In just the first month after it was leaked that the government was considering nationalizing YPF, the price of YPF's ADRs dropped over 20%.  By the end of February, it was reported that the Argentine legislature had prepared a plan to nationalize YPF and that the plan had been presented to President Kirchner.  YPF's ADR price dropped over 14% on the news.  The Argentine, U.S., and

13

Spanish press anticipated that a formal announcement of nationalization would come during the opening of the legislative session on March 1, 2012, but no such announcement was made. In mid-March, *Página/12* reported, once again attributing its story to unnamed government sources, that Argentina intended to nationalize YPF before winter began in the southern hemisphere. Chief Cabinet Minister Juan Manuel Abal Medina stated only that the government had not ruled out nationalization. Moody's subsequently downgraded YPF and other Argentine oil companies on the news. By the end of March, *Página/12* reported that President Kirchner had decided to nationalize YPF, and was merely determining which way to proceed. From that time until April 16, when the nationalization legislation was formally announced, YPF's ADRs fell another 23%. The steep decline in YPF's share price over the early part of 2012 as a result of the government's campaign against the Company occurred despite positive news from the Company during the same period, including its discovery of vast new oil reserves in Argentina.

31.    The government's campaign was not limited to press leaks. On February 23, 2012, Argentina's representative on YPF's board of directors sought to have several high-ranking government officials participate in a YPF board meeting. When those officials were not allowed to enter the meeting, the government's director refused to participate, and Argentina's *Comisión Nacional de Valores* (the Argentine securities regulator) subsequently voided the meeting entirely. And, upon information and belief, under pressure from Argentina, various provinces revoked and/or initiated revocation proceedings for more than a dozen of YPF's oil and gas concessions, including concessions for some of YPF's most productive fields. Upon information and belief,

14

under similar pressure, the *Comisión Nacional de Valores* and Argentine antitrust and tax authorities also took action with respect to YPF.

### Argentina's Retaking of Control over YPF and Repudiation of Its Tender Offer Obligations

32.     Culminating this broad offensive against YPF, on April 16, 2012, Argentina seized control of YPF's operations, appointed an intervenor vested with all the powers of the Company's board and president, and announced legislation that would expropriate 51% of the Company's Class D shares. The expropriation legislation was signed into law by President Kirchner on May 4, 2012, and went into effect on May 7, 2012.

33.     On April 16, 2012, by Emergency Decree No. 530, Argentina declared through its executive branch that it was taking complete control of YPF, effective immediately, by appointing the Minister of Planning, Julio De Vido, as "Intervenor" and vesting De Vido with all the powers of the Company's board of directors as well as those of its president. The control that Argentina gained over YPF through its Intervenor not only exceeded the thresholds that would trigger a mandatory tender offer, it was effectively total. It is now only Argentina, not the shareholders, who has the ability, among other things, to appoint management and establish dividend policy.

34.     That same day, government officials entered YPF's headquarters in Buenos Aires, seized control of the Company's facilities and otherwise began exercising control of the Company's operations. Argentina immediately replaced the Company's top management with government officials. Indeed, the Argentine press reported that even before President Kirchner had finished announcing the seizure and expropriation legislation, Argentina's board representative arrived at YPF's headquarters with a list of

15

executives, including the Company's CEO, who were given fifteen minutes to pack up

their belongings and leave the premises.  Within hours, Argentina's Intervenor, De Vido,

assumed control of the seizure operation and appointed government officials to run each

of the Company's key areas.

35.     Also on April 16, 2012, Argentina announced and delivered proposed

legislation by which Argentina would expropriate 51% of YPF's Class D shares, without

making the tender offer for the Company's outstanding Class D shares required under the

by-laws.

36.     Due to Argentina's April 16 seizure of control and announcement of the

expropriation legislation, the NYSE suspended trading of YPF's ADRs.  Since the NYSE

allowed trading to resume on April 18, the price of YPF's ADRs has plummeted by

another 26% as of market close on May 14, 2012.

37.     On April 17, 2012, Deputy Economy Minister Axel Kicillof, who was

appointed Vice-Intervenor in YPF by Decree No. 532, delivered a speech before the

Argentine Senate regarding Argentina's takeover of YPF, further underscoring

Argentina's breach and repudiation of its tender offer obligation.  Kicillof in fact

acknowledged the contractual tender offer obligation and its applicability to Argentina.

But Kicillof rejected the provision – which had been adopted into the by-laws by

Argentina itself – as a "bear trap" and a matter of YPF's "unfair" and internal by-laws.[2]

And Kicillof mocked the notion that Argentina should have to honor its legal obligations,

_____

[2] Kicillof stated: "In that unfair by-law, they said that if anyone dared to step foot, like the State itself – because, believe me, that if anyone wanted to buy shares to enter into the company, and passed 15%, he stepped in the bear trap and had to buy 100% of the company at a value equivalent to $19 billion. Because the fools are those who think that the State has to be stupid and buy everyone according to YPF's own law, respecting its by-law."

stating that only "fools" would expect Argentina to comply with its by-laws obligations, and declaring that "'[l]egal certainty' and 'investment climate' are two horrible words."

38.     On May 4, 2012, the expropriation legislation was signed into law as Law 26,741 (the "Expropriation Law"), which became effective on May 7, 2012. Title III of the Expropriation Law, labeled "Of the Recovery of Control of YPF," provides for the expropriation by Argentina of 51% of the Class D shares of YPF. Pursuant to the Expropriation Law, the expropriation process will be governed by Law 21,499, Argentina's 1977 law concerning expropriations.

39.     The Expropriation Law gives Argentina total and unequivocal control over YPF. As soon as it became effective, the Expropriation Law granted Argentina the power to exercise voting rights on all 51% of the Class D shares subject to expropriation. The Expropriation Law also provides that while the expropriated shares are to be divided between the federal executive (51%) and certain provinces (49%), all of the expropriated shares must be voted as a block for a minimum term of fifty years. The Law dictates that the block must pursue a slate of candidates for the board of directors who will proportionally represent the new holders of the expropriated shares – *i.e.*, the federal executive and the provinces – and a director to represent the Company's workers, rather than the shareholders.

40.     Argentina's failure to launch a tender offer for all YPF Class D shares despite having acquired control over a majority of YPF's stock constitutes a breach of its tender offer obligations. Through the Expropriation Law, Argentina acquired, among other rights, the power to vote 51% of YPF's Class D shares. Section 28 of the by-laws provides that any direct or indirect acquisition by Argentina that results in its exercising

control over at least 49% of the Company's stock mandates a tender offer for all Class D
shares.  Argentina's failure to launch such a tender offer is therefore in direct breach of
its contractual obligations under the by-laws.

41.     Argentina's announcement and enactment of the Expropriation Law and
related statements also have clearly demonstrated its intent to retake control of YPF
without any tender offer and to manage the Company for its own benefit, rather than that
of shareholders, in direct repudiation of the promises it made as selling shareholder of
YPF and has continuously repeated and ratified at all times since.  On April 23, 2012,
underscoring Argentina's disenfranchisement of YPF's shareholders, Argentina's
Intervenor cancelled the Company's annual general shareholders' meeting, which had
been scheduled for April 25 and at which it had been intended that the Company's annual
financial statements would be approved.  Argentina did not reschedule that meeting in
time to comply with requirements that financial statements be issued no later than April
30, 2012, and although the *Comisión Nacional de Valores* has scheduled an annual
meeting for June 4, 2012, approval of financial statements is not included on the agenda
for that meeting.

42.     As a result of Argentina's breaches and repudiation of its obligations,
Plaintiffs have suffered precisely the fate that Argentina had committed would not occur:
the transformation of YPF back into a government enterprise, without their being offered
the opportunity to exit on the terms set by the by-laws.  Plaintiffs have accordingly
sustained significant damages.  They seek compensation for those damages, as well as
declaratory and injunctive relief as set forth below.

<center>18</center>

43.     Plaintiffs Repsol and Yale Capital and all other members of the plaintiff
class expressly reserve the right to bring other claims not asserted herein that may relate
to Argentina's takeover of YPF, including without limitation such claims as may be
necessary to prevent any improper interference or unfair competition by third parties
seeking to take advantage of the current circumstances to profit at the expense and in
violation of the rights of YPF's now disenfranchised shareholders.  Repsol specifically
reserves its rights and remedies under: (a) Argentine law and any other applicable legal
order; and (b) the Agreement for the Reciprocal Promotion and Protection of Investments
between the Kingdom of Spain and the Argentine Republic signed on 3 October 1991
(and which entered into force on 28 September 1992) duly notified to the Argentine
Republic by letter dated May 10, 2012, which rights and remedies are not pursued in the
present action.

## CLASS ACTION ALLEGATIONS

44.     Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(2),
and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all
record or beneficial holders of Class D shares of YPF stock, either directly or through
ADRs, who held at the time of Argentina's breach and repudiation of its tender offer
obligations, and who were damaged thereby (the "Class").  The Class definition excludes
the Class D shares held by Repsol subject to the expropriation process.  The Class also
excludes Argentina and any of its instrumentalities, agencies, provinces, departments, or
state-run or state-controlled enterprises or funds who may hold Class D shares.

45.     The members of the Class are so numerous that joinder of all members is
impracticable.  While the exact number of Class members is unknown to Plaintiffs at this

time and can only be ascertained through appropriate discovery, Plaintiffs believe that the Class members number at least in the thousands. Plaintiffs also believe that members of the Class are geographically dispersed.

46.     Plaintiffs' claims are typical of the claims of the Class members because Plaintiffs and all Class members are holders of YPF Class D shares, either directly or through ADRs. YPF's by-laws constitute an enforceable contract among YPF's shareholders, including Defendant Argentina and each member of the plaintiff Class. Argentina has commonly breached its contract with Plaintiffs and all Class members, including by retaking control of the Company without honoring its tender offer obligations, and by repudiating its tender offer obligations.

47.     Plaintiffs will fairly and adequately protect the interests of the Class as the interests of Plaintiffs are coincident with, and not antagonistic to, those of the Class. In addition, Plaintiffs are represented by counsel competent and experienced in complex commercial and securities litigation.

48.     Argentina has acted and refused to act in a manner generally applicable to the Class, thereby making final injunctive or declaratory relief appropriate with respect to the Class as a whole.

49.     Questions of law and fact common to the members of the Class predominate over questions that may affect only individual members. Among those questions of law and fact common to the Class are the nature of Argentina's obligations under the tender offer provisions, Argentina's breaches and repudiation of those obligations, and the price at which a tender offer should have been made pursuant to the by-laws.

50.     Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged herein.  Such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous individual actions would entail.  No difficulties are likely to be encountered in the management of this class action that would preclude its maintenance as a class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.  Upon information and belief, the Class is readily ascertainable from the Defendant's records and the records of the depositary agent.

### FIRST CAUSE OF ACTION:
### BREACH OF CONTRACT

51.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 50 above.

52.     Argentina enacted provisions in the by-laws assuring YPF's investors that if it ever acquired a controlling stake in YPF, it would make a public tender offer for all of YPF's outstanding Class D shares.

53.     YPF's by-laws constitute an enforceable contract.  Defendant Argentina and each member of the plaintiff Class are YPF shareholders, parties to that contract. Members of the plaintiff Class are alternatively entitled to enforce the by-laws because they are third-party beneficiaries of that contract.  Sections 7 and 28 are intended to benefit all record or beneficial holders of Class D shares and the benefit of those provisions to the plaintiff Class is immediate, not merely incidental, as they directly assure Class members that Argentina must offer them a compensated exit should it seek to retake control of YPF.

21

54.     Pursuant to the terms of the by-laws, Argentina is prohibited from exercising control over YPF without launching a tender offer for all Class D shares in accordance with Sections 7 and 28 of the by-laws.

55.     Argentina breached that contract by failing to make a tender offer as required by the by-laws as a condition of its exercising control over YPF as of April 16, 2012, and as a result of its acquiring control over a majority of YPF's shares as of May 4, 2012.

56.     The plaintiff Class has been damaged by Argentina's breach in an amount to be determined according to proof.

## SECOND CAUSE OF ACTION:
## ANTICIPATORY REPUDIATION

57.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 56 above.

58.     Argentina enacted provisions in the by-laws assuring YPF's investors that if it ever acquired a controlling stake in YPF, it would make a public tender offer for all of YPF's outstanding Class D shares.

59.     YPF's by-laws constitute an enforceable contract.  Defendant Argentina and each member of the plaintiff Class are YPF shareholders, parties to that contract. Members of the plaintiff Class are alternatively entitled to enforce the by-laws because they are third-party beneficiaries of that contract.  Sections 7 and 28 are intended to benefit all record or beneficial holders of Class D shares and the benefit of those provisions to the plaintiff Class is immediate, not merely incidental, as they directly assure Class members that Argentina must offer them a compensated exit should it seek

22

to retake control of YPF. Plaintiffs remain ready, willing, and able to perform their
obligations under the Company's by-laws as holders of YPF Class D shares.

60.     Pursuant to the terms of the by-laws, Argentina is prohibited from
exercising control over YPF without launching a tender offer for all Class D shares in
accordance with Sections 7 and 28 of the by-laws.

61.     Argentina has repudiated its contractual tender offer obligations by
unequivocally expressing its intention to acquire ownership or control of a majority of the
Company's shares without making any such tender offer, in material breach of its
obligations under the tender offer provisions, a breach that would give rise to a claim for
damages for breach of contract, and by taking voluntary affirmative actions that render it
unable or apparently unable to perform without such breach. The plaintiff Class has been
damaged as a result of Argentina's repudiation of its tender offer obligations in an
amount to be determined according to proof.

<div align="center">

**THIRD CAUSE OF ACTION:**
**PROMISSORY ESTOPPEL**

</div>

62.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1
through 61 above.

63.     In connection with the privatization and public offering of YPF and
continuously at all times thereafter, Argentina promised to U.S. and other investors that it
would not retake control of YPF without making a tender offer to all Class D
shareholders as provided in the by-laws. Those promises were communicated to
investors by means including the by-laws and the U.S. IPO Prospectus. Argentina
repeated these promises on a regular basis to the U.S. market, including every time the

Company's by-laws were publicly filed with the SEC in connection with YPF's periodic reporting requirements under U.S. securities laws.

64.     Argentina made these promises with the intention to induce reliance and specifically with the intention to induce Class members to purchase shares in YPF, and the value of Argentina's promises was priced into the value of Class D shares at all times. It was therefore reasonable and foreseeable that Class members would rely on Argentina's promise in purchasing their Class D shares of YPF.

65.     The plaintiff Class relied on Argentina's promises to their detriment, including because, among other things, they have been denied the promised tender offer and instead hold devalued YPF Class D shares without the benefit of the compensated exit they were promised.

### FOURTH CAUSE OF ACTION:
### DECLARATORY JUDGMENT

66.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1 through 65 above.

67.     An actual and justiciable controversy has arisen and now exists between the plaintiff Class and Argentina, as Argentina has reacquired control of YPF and has unequivocally expressed its intention not to launch a tender offer for all outstanding Class D shares in contravention of YPF's by-laws.

68.     As shareholders of YPF who have been adversely impacted by Argentina's failure to make a tender offer as promised, Plaintiffs have standing to bring this action.

69.     Plaintiffs seek a declaration (a) that as a contractual consequence of its having seized control of YPF, Argentina is obligated to launch a tender offer for all Class

D shares on the terms set forth in Sections 7 and 28 of the Company's by-laws; (b) that as

a contractual consequence of its having acquired a 51% interest in the Class D shares of

YPF, Argentina is obligated to launch a tender offer for all Class D shares on the terms

set forth in Sections 7 and 28 of the Company's by-laws; and (c) that unless and until

such tender offer has been made, the shares acquired by Argentina in violation of the

tender offer provisions shall have no right to vote, receive dividends or be counted

towards a quorum.

70.     Due to Argentina's efforts to drive down the value of YPF's shares,

Plaintiffs further seek a declaration of the relevant date for calculating the tender offer

price pursuant to the by-laws, to be determined by this Court.

### FIFTH CAUSE OF ACTION:
### BREACH OF IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING

71.     Plaintiffs repeat and reallege the allegations contained in paragraphs 1

through 70 above.

72.     YPF's by-laws constitute an enforceable contract.  Defendant Argentina

and each member of the plaintiff Class are YPF shareholders, parties to that contract.

Members of the plaintiff Class are alternatively entitled to enforce the by-laws because

they are third-party beneficiaries of that contract.  Sections 7 and 28 are intended to

benefit all record or beneficial holders of Class D shares and the benefit of those

provisions to the plaintiff Class is immediate, not merely incidental, as they directly

assure Class members that Argentina must offer them a compensated exit should it seek

to retake control of YPF.

73.     A duty of good faith and fair dealing is implied in the by-laws and binds

the parties thereto.  This duty implies obligations consistent with the other terms of the

contract, including the obligation that Argentina would not take actions to cause Class members' rights under the contract to be devalued.

74.     Argentina breached this implied duty of good faith and fair dealing by, among other things, conducting a wide-ranging campaign against YPF beginning in January 2012 that caused the price of YPF's shares to drop precipitously. Argentina engaged in this conduct with the intent and effect to depress the price at which it could be obligated to make a tender offer under the terms of its contract with the plaintiff Class.

75.     Argentina's actions have had the effect of depriving Class members of the full benefit of their bargain, specifically their right under the tender offer price provisions of the by-laws to be offered fair consideration for their shares, free from manipulation, in the event Argentina retook control of YPF. The plaintiff Class has been damaged by Argentina's breach of the implied duty of good faith and fair dealing in an amount to be determined according to proof.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter an order and judgment awarding:

A.     Compensatory damages according to proof;

B.     A declaration that Argentina is required to make a tender offer pursuant to the terms of the by-laws;

C.     A declaration that the price for such tender offer is to be determined on the basis set forth in the by-laws, as of a date to be determined according to proof;

26

D.      A declaration that, unless and until Argentina has launched a tender offer in accordance with the by-laws, all shares acquired by Argentina in contravention of those by-laws are stripped of any right to vote, collect dividends or other distributions, and shall not be counted towards a quorum of shareholders;

E.      An injunction preventing Argentina from exercising voting rights or rights to dividends or other distributions or other rights pertaining to the shares acquired by Argentina in violation of YPF's by-laws unless and until a tender offer has been launched in accordance with the by-laws; and

F.      Such other and further relief as the Court may deem just and proper.

Dated:   New York, New York
         May 15, 2012

                                        DAVIS POLK & WARDWELL LLP

                                        By:

                                             Michael P. Carroll
                                             Antonio J. Perez-Marques

                                             450 Lexington Avenue
                                             New York, New York 10017
                                             (212) 450-4000
                                             michael.carroll@davispolk.com
                                             antonio.perez@davispolk.com

                                             *Attorneys for Plaintiffs Repsol YPF, S.A. and
                                             Texas Yale Capital Corp.*

27

# Exhibit 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

REPSOL YPF, S.A.,

                  Plaintiff,

      - against -

REPUBLIC OF ARGENTINA,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**12 CV     4018**

Civil Action No. _____

**COMPLAINT**

Plaintiff Repsol YPF, S.A. ("Repsol"), by its attorneys Davis Polk & Wardwell

LLP, alleges as follows for its complaint herein:

## NATURE OF THE ACTION

1.      Defendant the Republic of Argentina ("Argentina") is in violation of its

disclosure obligations under the United States securities laws. On May 7, 2012,

Argentina acquired beneficial ownership of more than 5% of a registered class of equity

securities of YPF S.A. ("YPF" or the "Company"). As a result, the disclosure

requirements of Section 13(d) of the Securities Exchange Act of 1934 (the "Exchange

Act") were triggered. Argentina has violated those requirements by failing to file a

Schedule 13D with the SEC on or before May 17, 2012.

2.      Section 13(d) requires that any entity that directly or indirectly acquires

beneficial ownership of more than 5% of a registered class of an issuer's equity securities

must, within ten days of the transaction, file a Schedule 13D disclosure statement with

the SEC. The Schedule 13D must contain the information specified in Section 13(d) and

SEC rules promulgated thereunder, including the number of shares beneficially owned;

the source and amount of the funds to be used in the acquisition; information as to any

contracts, arrangements, or understandings with any entity relating to the securities of the

issuer; and the beneficial owner's plans for the issuer's business and governance. Section

13(d) thus mandates the disclosure of information that shareholders need in order to make

informed decisions with respect to their investments in the issuer.

3.      Argentina's Section 13(d) disclosure obligations were triggered on May 7,

2012, when Law 26,741 (the "Expropriation Law") went into effect, providing for

Argentina's expropriation of 51% of the Class D shares of YPF. YPF's Class D shares

are registered under the Exchange Act, and are traded on the New York Stock Exchange

("NYSE") in the form of American Depositary Receipts ("ADRs"). Immediately upon

its effectiveness, the Expropriation Law granted Argentina the power to exercise all

rights attached to the shares subject to expropriation, including the power to exercise

voting rights on all of those shares. Under SEC Rule 13d-3, any entity that directly or

indirectly holds the power to vote or direct the vote of a security is the beneficial owner

of the security for purposes of Section 13(d). The Expropriation Law therefore rendered

Argentina the beneficial owner of more than 5% of a registered class of YPF's equity

securities as of May 7, 2012, and obligated Argentina to file a Schedule 13D with the

SEC by May 17, 2012.

4.      More than ten days have passed since Argentina acquired beneficial

ownership of more than 5% of YPF's Class D shares, but Argentina has failed to file any

Schedule 13D with the SEC. (Indeed, Plaintiff Repsol has waited beyond the May 17

deadline to file this action, allowing Argentina additional time to comply with its Section

13(d) obligations, but as of today Argentina has still failed to file a Schedule 13D with

the SEC.)  Argentina has thus violated and remains in violation of Section 13(d).

Accordingly, Plaintiff, a shareholder of YPF, brings this action seeking a judgment

declaring that Argentina is in violation of Section 13(d), and ordering Argentina to file

the required Schedule 13D forthwith.

## PARTIES

5.     Plaintiff Repsol is a publicly-held limited liability company (*sociedad
anónima*) organized under the laws of the Kingdom of Spain and headquartered in
Madrid, Spain.  Repsol is a holder of YPF Class D shares directly and through its
ownership of ADRs administered by the Bank of New York as depositary agent.
Through a series of transactions in 1999, Repsol acquired a controlling stake in YPF and
remains one of YPF's largest shareholders.  The Expropriation Law provides that the
51% of YPF's Class D shares that are subject to expropriation shall be taken solely from
Repsol.

6.     Defendant the Republic of Argentina is also a shareholder of YPF, and
specifically is the exclusive holder of YPF's Class A stock, which is not a registered
class, holding 3,764 such Class A shares as of December 31, 2011.  In addition,
Argentina acquired beneficial ownership of 51% of the Class D shares of YPF upon the
effectiveness of the Expropriation Law on May 7, 2012.  Argentina is organized as a
federation of twenty-three provinces and an independent federal city (Buenos Aires).

7.     Non-party YPF is a publicly-held limited liability stock company
(*sociedad anónima*) organized under the laws of Argentina.  The address of its principal
executive offices is Macacha Güemes 515, 1106, Buenos Aires, Argentina.  Prior to
1993, YPF was an exclusively state-owned, monopolist oil and gas company.  Argentina
privatized YPF in the early 1990s, and took it public in 1993.  The Company's Class D

3

shares are registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78*l*, and

trade on the NYSE in the form of ADRs under the symbol "YPF."

### JURISDICTION AND VENUE

8.      This action arises under Section 13(d) of the Exchange Act, 15 U.S.C.

§ 78m(d), and the rules and regulations promulgated thereunder by the SEC.

9.      This Court has jurisdiction over the subject matter of this action pursuant

to 28 U.S.C. § 1330 because this is a non-jury civil action against a foreign state, as

defined in 28 U.S.C. § 1603(a), involving a claim for relief *in personam* with respect to

which the foreign state is not entitled to immunity under 28 U.S.C. § 1605(a), or under

any applicable international agreement.  In particular, Defendant Argentina is not entitled

to immunity under 28 U.S.C. § 1605(a)(2) because the claim asserted arises out of

Argentina's failure to fulfill its obligation as the beneficial owner of shares registered on

the NYSE to file a disclosure statement with the SEC for the benefit of U.S. investors, in

violation of U.S. securities laws.  The claim is thus based not on any sovereign activity,

but on Argentina's commercial activity and its acts in connection therewith, which have

been carried on and performed and have caused direct effects in the United States.

10.      Venue in the Southern District of New York is proper pursuant to Section

27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1391.

11.      Declaratory relief is appropriate pursuant to 28 U.S.C. § 2201 because an

actual controversy exists regarding whether Argentina is in violation of Section 13(d)'s

disclosure requirements.

4

## FACTUAL ALLEGATIONS

### Argentina's Acquisition of Beneficial Ownership of More than 5% of a Registered Class of YPF's Equity Securities

12.     YPF formerly was an entirely state-owned and state-run enterprise, dominated and controlled by Argentina as its sole shareholder.  Argentina privatized YPF in the early 1990s, and took it public in 1993 through an SEC-registered IPO of YPF Class D shares.  Those shares were offered on the Buenos Aires Stock Exchange and were offered in the form of ADRs on the NYSE and other exchanges outside the United States and Argentina.  The single largest portion of the public offering was Argentina's sale of shares into the United States, which represented 65,000,000 of the total 140,000,000 Class D shares offered in the IPO, and resulted in proceeds of over $1.1 billion to Argentina as selling shareholder.  YPF's Class D shares now comprise almost 100% of YPF's outstanding capital stock, and approximately 60% of those Class D shares are represented by ADRs.

13.     Argentina continued to have a significant role as a shareholder of YPF after the privatization and public offering.  Argentina remained the exclusive holder of YPF's Class A "golden" shares, holding 3,764 such shares as of December 31, 2011.  Pursuant to YPF's by-laws, as the holder of Class A shares, Argentina enjoyed certain privileges, including the right to appoint one director and one alternate director, as well as veto rights with respect to specific categories of corporate activities, such as the acquisition by a third party of shares representing more than 50% of YPF's capital stock.

14.     As of the end of 2011, the Argentine government appeared to be wholly supportive of YPF.  Indeed, in November 2011, Argentina's board representative stated that the government was in complete accord with the Company's activities.  Yet in

January 2012, the Argentine press began reporting that the government was considering

nationalizing YPF. After more than two months of government leaks that stoked rumors

of impending nationalization and caused YPF's share price to collapse, Argentina carried

out its threat, retaking control of the Company.

15.   On April 16, 2012, Argentina announced and delivered proposed

legislation providing for the expropriation of 51% of YPF's Class D shares. Also on

April 16, Argentina declared by executive decree that it was seizing control of the

Company's operations through the appointment of an "intervenor" vested with all powers

of the Company's board and president. That same day, government officials entered

YPF's headquarters in Buenos Aires, seized control of the Company's facilities, removed

top executives, and began appointing government delegates to run the Company's

operations.

16.   On May 4, 2012, the proposed expropriation legislation was signed into

law by President Kirchner, and it went into effect on May 7, 2012. Title III of the

Expropriation Law, labeled "Of the Recovery of Control of YPF," provides for the

expropriation by Argentina of 51% of the Class D shares of YPF, all from Repsol.

Pursuant to the Expropriation Law, the expropriation process will be governed by Law

21,499, Argentina's 1977 law concerning expropriations.

17.   The Expropriation Law gives Argentina total and unequivocal control over

YPF. While, as of the date of this Complaint, formal title to the expropriated shares has

not yet been transferred to Argentina, as soon as the Expropriation Law became effective

on May 7, 2012, it granted Argentina the power to exercise all voting, economic, and

other rights on all of the shares subject to expropriation. The Expropriation Law also

6

provides that while the expropriated shares are to be divided between the federal executive (51%) and certain provinces (49%), all of the expropriated shares must be voted as a block for a minimum term of fifty years. The Expropriation Law thus grants Argentina total and exclusive control over the shares subject to expropriation, and it is now only Argentina, not Repsol, that has the ability to vote or transfer those shares.

### Argentina's Failure to Comply with Section 13(d) of the Exchange Act

18.     Section 13(d) of the Exchange Act mandates that any entity that directly or indirectly acquires beneficial ownership of more than 5% of a registered class of an issuer's equity securities must, within ten days of the acquisition, file a statement with the SEC disclosing certain information specified in Section 13(d) and applicable SEC rules. The SEC has prescribed Schedule 13D as the official disclosure form for compliance with the statute. 17 C.F.R. §§ 240.13d-1, 240.13d-101.

19.     Among the information that must be disclosed in a Schedule 13D is a description of the beneficial owner's plans for the issuer, including any plans relating to or that would result in: the acquisition of additional securities of the issuer or the disposition of securities of the issuer; an extraordinary corporate transaction involving the issuer, such as a merger, reorganization, or liquidation; a sale or transfer of a material amount of assets of the issuer; any change in the issuer's board of directors or management; any material change in the issuer's capitalization or dividend policy; any other material change in the issuer's business or corporate structure; any change in the issuer's charter or by-laws; causing the issuer's securities to be delisted from a national securities exchange; or the issuer's securities becoming eligible for termination of registration under the Exchange Act. 17 C.F.R. § 240.13d-101.

7

20.     Upon becoming effective on May 7, 2012, the Expropriation Law rendered Argentina the beneficial owner of more than 5% of YPF's Class D shares, which are registered under the Exchange Act.  The Expropriation Law rendered Argentina a beneficial owner because, among other reasons, the Law conferred upon Argentina the power to exercise voting rights on all 51% of the Company's Class D shares subject to expropriation.  Under SEC Rule 13d-3, any entity that directly or indirectly holds (or shares) the power to vote or direct the vote of a security is a beneficial owner of the security for purposes of Section 13(d).  Argentina was consequently required under Section 13(d) to file a Schedule 13D with the SEC relating to its acquisition of beneficial ownership of YPF's Class D shares within ten days of the effectiveness of the Expropriation Law – *i.e.*, by May 17, 2012.  Argentina has not filed a Schedule 13D with the SEC, and is therefore in violation of its disclosure obligations under Section 13(d).

21.     One of the fundamental purposes of the U.S. securities laws is to ensure full disclosure of material information for the benefit of investors.  Because Argentina acquired beneficial ownership of more than 5% of YPF's Class D shares, it is required to file a Schedule 13D with the SEC containing information without which Plaintiff and other YPF shareholders cannot make informed decisions with respect to their investments and participation in a Company now once again dominated and controlled by the Argentine government.

22.     Argentina has failed to comply with its disclosure obligations under Section 13(d), and Plaintiff accordingly brings this action seeking to enforce those obligations.  In bringing this action, Plaintiff Repsol does not concede the validity or

enforceability of the expropriation itself, which are not the subject of this action, and which Repsol expressly reserves the right to challenge in any forum. Repsol specifically reserves its rights and remedies under: (a) Argentine law and any other applicable legal order; and (b) the Agreement for the Reciprocal Promotion and Protection of Investments between the Kingdom of Spain and the Argentine Republic signed on 3 October 1991 (and which entered into force on 28 September 1992) duly notified to the Argentine Republic by letter dated May 10, 2012, which rights and remedies are not pursued in the present action.

## FIRST CAUSE OF ACTION:
## VIOLATION OF SECTION 13(d) OF THE EXCHANGE ACT

23.     Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 22 above.

24.     Plaintiff is a holder of YPF Class D shares, directly and through ADRs.

25.     Upon the effectiveness of the Expropriation Law on May 7, 2012, Argentina beneficially owned more than 5% of YPF's Class D equity securities, which are registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78*l*.

26.     Argentina violated and remains in violation of Section 13(d) of the Exchange Act by failing to file a Schedule 13D within ten days after acquiring beneficial ownership of more than 5% of YPF's Class D shares.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

A.     Declaring that Argentina is in violation of Section 13(d) of the Exchange Act for failure to file a Schedule 13D with the SEC relating to its acquisition of beneficial ownership of more than 5% of the Class D shares of YPF;

       B.     Ordering Argentina to file such a Schedule 13D with the SEC, in

compliance with the applicable rules and regulations, forthwith; and

       C.     Granting such other and further relief as the Court may deem just

and proper.

Dated:  New York, New York
       May 21, 2012

                        DAVIS POLK & WARDWELL LLP

                        By:     _____
                           Michael P. Carroll
                           Antonio J. Perez-Marques

                        450 Lexington Avenue
                        New York, New York 10017
                        (212) 450-4000
                        michael.carroll@davispolk.com
                        antonio.perez@davispolk.com

                        *Attorneys for Plaintiff Repsol YPF, S.A.*

# Exhibit 3



 Imprimir | Regresar a la nota

El país | Sábado, 16 de junio de 2012

**LA PRESIDENTA SE REUNIO CON EMPRESARIOS Y GARANTIZO QUE APUNTALARA EL CRECIMIENTO**

# "Vamos a tomar las medidas necesarias"

**Más de cuarenta representantes de las principales empresas de Estados Unidos participaron del almuerzo con CFK en el Council of Americas. La Presidenta habló de YPF, del dólar y de la crisis internacional.**

**Por Victoria Ginzberg**

Desde Nueva York



Cristina Kirchner, en el centro de la mesa principal, junto a empresarios norteamericanos y funcionarios argentinos.

"Tough questions, very good answers" ("Preguntas difíciles, muy buenas respuestas"), así resumió uno de los empresarios la reunión con la presidenta Cristina Kirchner que se realizó ayer en la sede del Council of Americas, en Nueva York. Al encuentro, que duró más de una hora, concurrieron más de cuarenta hombres y mujeres de negocios. Allí, CFK remarcó el crecimiento de la economía argentina, habló de su interés en propiciar inversiones conjuntas entre el sector privado y el Estado y explicó por qué se nacionalizó YPF. Sobre la empresa petrolera, anunció un road show para "hacer una oferta de modelos de negocios, producción, explotación y servicios". También se refirió a la crisis que afecta a la Eurozona. En ese sentido, envió un mensaje interno ("vamos a tomar todas las medidas necesarias para sostener el crecimiento y seguir incluyendo a los argentinos") y uno hacia el exterior: "Estamos ante un nuevo mundo, una nueva etapa y va a exigir nuevas definiciones y nuevas soluciones. Este enfermo no se cura con viejos medicamentos ni con recetas viejas. Que los médicos cambien las recetas, porque si no finalmente la gente elegirá también nuevos médicos".

Cerca del mediodía, varios hombres de traje y algunas mujeres comenzaron a entrar en el edifico de estilo neofederal que la familia Rockefeller donó al think tank de política y economía vinculado con "las Américas". Varios llevaban una valija de mano, señal que acababan de llegar del aeropuerto o que partirían para allí enseguida después del encuentro. Coches lujosos, pero no limusinas, los esperaron estacionados sobre Park Avenue, incluso a doble fila. Las banderas norteamericana y la argentina lucían por encima de la entrada principal, que da a la más elegante y residencial avenida de la ciudad. Cristina Kirchner usó la puerta que está sobre la calle 68. Allí la recibió Susan Seagal, directora del Council, quien conoce a CFK desde sus tiempos de senadora y primera dama.

## Gira mágica y misteriosa

En la reunión hubo altos ejecutivos de, entre otras empresas, IBM, JP Morgan, Ford, Fox, DirecTV, Cargill, Barrick Gold, Walmart, Procter & Gamble, Pfizer, Monsanto y Microsoft. Especial interés despertó la presencia de las petroleras Exxon y Chevron, que ya se habían reunido con el ministro de Planificación, Julio De Vido, luego de la nacionalización de YPF, con el fin de explorar posibilidades de hacer alianzas con la petrolera argentina para ampliar las inversiones del sector e incrementar la producción. El encuentro fue privado, pero el discurso de CFK se pudo escuchar a través de un televisor colocado en la planta baja del Council. Cuando salieron, luego del almuerzo, la mayoría de los asistentes se retiraron a las apuradas. Los que aceptaron conversar, remarcaron que le habían preguntado sobre todos los temas (el dólar, el control de precios, el petróleo) y que se habían quedado conformes con el resultado.

La Presidenta anunció que YPF hará un road show "para hacer una oferta de los modelos de negocios de producción y explotación y de servicios que hoy puede tener el mundo petrolero, con lo que constituye la empresa más importante de la República Argentina". Un road show es un evento en el que se da a conocer una marca o producto a sus potenciales inversores de manera directa a través de una gira por distintas ciudades. La Agencia Nacional de Hidrocarburos de Colombia, por ejemplo, realizó en mayo viajes a Nueva York y muchas otras ciudades del mundo para promover la licitación de 109 zonas petroleras y gasíferas. En la delegación argentina no se conocían aún detalles de los planes de YPF, aunque se daba por hecho que la gira la encabezaría el presidente de la empresa, Miguel Galuccio, y con que Houston es un destino cantado.

Hubo más menciones a YPF. CFK señaló que la adquisición por parte del empresario mexicano Carlos Slim del 8 por ciento del paquete accionario era una "buena noticia" y luego se detuvo para explicarles a los ejecutivos presentes el porqué de la estatización del 51 por ciento de la compañía. "Hemos elegido el camino más difícil, podríamos haber hecho una nacionalización; una estatización del ciento por ciento del capital de YPF. Pero hemos elegido solamente tomar lo que nos permite el control de la compañía, seguir en la Bolsa de Nueva York, lo cual nos obliga a controles muy importantes, por la Comisión de Valores de nuestro país y de la SEC (la Comisión de Valores de Estados Unidos)". Mencionó que "no fue una expropiación que hubiéramos deseado hacer; simplemente por primera vez en la Argentina –en los últimos 17 años– habíamos tenido un déficit hidrocarburífero de más de 3000 millones, que nos comía parte de nuestro excelente superávit comercial y la política de la empresa (Repsol) era de desinversión en el país". Según mencionaron luego los ministros de Relaciones Exteriores, Héctor Timerman, y de Industria, Débora Giorgi, los empresarios le preguntaron a la Presidenta dónde veía YPF en cinco o diez años y ella respondió que "su sueño era que la política petrolera sea una política de Estado, que sirva para el desarrollo nacional y que sea una empresa de la que todos podamos estar orgullosos".

## Proyectos

Además de Timerman, Giorgi y De Vido, a la larga mesa del salón Bolívar del Council of Americas también se sentaron el ministro de Economía, Hernán Lorenzino, y el secretario de Legal y Técnica, Carlos Zannini. La Presidenta recordó allí que Estados Unidos es el segundo inversor en la Argentina, con más de 500 empresas, y que el 60 por ciento de las empresas más importantes de este país tiene desarrollo y crecimiento permanente en la Argentina.

Durante el encuentro anunció, mientras mostraba el prospecto, una inversión de Monsanto por 1800 millones de dólares (ver aparte). También ponderó un proyecto del laboratorio Pfizer, junto con ELEA, para la producción de una vacuna. Luego, Giorgi destacó que la empresaria de Pfizer pidió la palabra durante el encuentro para manifestar su satisfacción por el trabajo conjunto que están llevando a cabo.

## La crisis

Case 1:12-cv-04018-TPG   Document 16   Filed 02/15/13   Page 46 of 72

La Presidenta se refirió a la crisis europea y a su impacto en la Argentina. "Logramos acumular una gran cantidad de reservas que nos dan una posición de manejo sólido de no prolongarse demasiado la crisis en la Eurozona y si Estados Unidos pueda volver a convertirse en un motor de la economía mundial. Como los datos no son alentadores, obviamente los mercados reaccionan y pese a toda la solidez que hemos hecho, esto también tiene impacto en nuestra economía. Pero sostenemos que va a tener mucho menor impacto de lo que puede tener en otros países", dijo. Y aprovechó para hacer su diagnóstico y proponer un tratamiento, algo que seguramente retomará la semana próxima cuando participe en Los Cabos, México, de la reunión del G-20. "El principal problema que hoy afronta el mundo, más que económico, es una falta de liderazgo político claro y concreto de cómo abordar la crisis", señaló. Luego explicó que a su entender la crisis se resuelve a través del fortalecimiento del mercado interno, con acciones que favorezcan la demanda agregada en vez de políticas dirigidas al sector financiero. Y aunque señaló que en el marco de la situación mundial es posible que la Argentina no avance a las tasas de los últimos años, dijo que tomaría todas las medidas necesarias para sostener el crecimiento.

Contó una anécdota para respaldar sus argumentos. Relató que el año pasado, cuando se reunió con Nicolas Sarkozy en el Palacio Elíseo, ella le sugirió que, para solucionar los problemas de Grecia, deberían hacer algo similar a lo que hizo la Argentina en 2001, esto es, una reestructuración de la deuda con una quita, "de modo que el esfuerzo sea compartido". Sarkozy, entonces, se tiró hacia atrás y le dijo: "No, eso es imposible". "Bueno –concluyó la Presidenta–, a los pocos meses ya estaban hablando del 60 por ciento de la quita en Grecia y hoy Nicolás no preside Francia."

© 2000-2013 www.pagina12.com.ar | República Argentina | Todos los Derechos Reservados

Sitio desarrollado con software libre GNU/Linux.

**"We will take the necessary measures"**

More than forty representatives of major United States companies participated in lunch with CFK in the Council of the Americas. The President spoke of YPF, the dollar and the international crisis.

By Victoria Ginzberg

From New York

"Tough questions, very good answers," is how one businessman summed up the meeting with President Cristina Kirchner which was held yesterday in the head office of the Council of the Americas, in New York.  The meeting, which lasted more than an hour, was attended by more than forty men and women in business.  There, CFK highlighted the growth of the Argentine economy, spoke of her interest in promoting joint investment between the private sector and the State, and explained why YFP was nationalized. Regarding the oil company, she announced a road show to "make an offering of business, production, exploitation and services models." She also referred to the crisis affecting the Eurozone. In that sense, she sent an internal message ("we will take all the necessary measures to sustain growth and continue including Argentines") and one to the outside: "We are facing a new world, a new stage and will demand new definitions and new solutions.  This sickness cannot be cured with old drugs or with old recipes. Physicians must change their prescriptions, because if they don't, people will eventually choose new physicians."

Around noon, several men in suits and some women began to enter in the building of neo style that the Rockefeller family donated to the policy and economy think tank linked to "the Americas." Several had suitcases in hand, who had just arrived from the airport or signaling that they would be heading there immediately after the meeting. Luxury cars, but no limousines, waited for them, parked and double-parked outside on Park Avenue. American and Argentine flags hung above the main entrance, facing the city's most elegant and residential avenue. Cristina Kirchner used the door located on 68th Street. There she was received by Susan Seagal, Director of the Council, who knows CFK since their days as Senator and first lady.

**Magic and Mysterious Tour**

In attendance at the meeting were senior executives from such companies as IBM, JP Morgan, Ford, Fox, DirecTV, Cargill, Barrick Gold, Walmart, Procter & Gamble, Pfizer, Monsanto and Microsoft. Of special interest was the presence of oil companies Exxon and Chevron, which had met with Planning Minister Julio De Vido, following the nationalization of YPF, to explore possibilities of alliances with Argentina to expand oil sector investment and increase production. The meeting was private, but CFK's speech could be heard through a television placed on the ground floor of the Council. When they left, after lunch, most of the attendees were removed in a hurry. Those who agreed to talk remarked that she had been asked about all topics (the dollar, price controls, oil) and that they had been satisfied with the result.

The President announced that YPF will do a road show "make an offering of business, production, exploitation and services models that the oil world can have today, which is the most important company of Argentina." A road show is an event in which a brand or product is

described to potential investors directly through a tour of various cities. The National Hydrocarbons Agency of Colombia, for example, in May, conducted trips to New York and many other cities around the world to promote the bidding for 109 oil and gas zones. The Argentina delegation yesterday did not provided details of YPF's plan, although it is assumed that the company president, Miguel Galuccio, will head the road show, and that Houston is an intended destination.

There were more references to YPF.  CFK said the acquisition by the Mexican businessman Carlos Slim of 8 percent of the shares was "good news" and then stopped to explain to the executives present the reason for nationalization of 51 percent of the company. "We have chosen the most difficult path, we could have performed a complete nationalization, nationalization of one hundred percent of YPF. But we chose to only to take that which allowed us control of the company, remain on the New York Stock Exchange, which binds us to very important controls, by the Securities Commission of our country and the SEC (the Securities Commission of the United States)." She mentioned that "It was not an expropriation that we wanted to do, but rather, for the first time in Argentina - in the last 17 years - we had a hydrocarbon deficit of over 3 billion, that was eating away at our excellent trade surplus and the Company (Repsol) policy was to divest the country." According to foreign ministers, Héctor Timerman, and Industry, Debora Giorgi, who spoke later, business owners asked the President where she saw YPF in five or ten years and she replied that "her desire was that oil policy would be a State policy, encouraging national development, and that it be a company of which we can all be proud."

### Projects

Besides Timerman, Giorgi and De Vido, at the long table in the Bolívar room of the Council of Americas also sat Economy Minister Hernan Lorenzino and Legal and Technical Secretary Carlos Zannini. The President recalled there that the U.S. is the second-largest investor in Argentina, with more than 500 companies, and that 60 percent of the largest companies in this country have development and growth in Argentina.

During the meeting, while showing the prospectus, she announced that Monsanto had made a $1.8 billion investment (see separate article). She also considered a Pfizer laboratory project, together with ELEA, for the production of a vaccine. Then, Giorgi requested that the businesswoman from Pfizer speak at the meeting to express their satisfaction with the joint work being undertaken.

### The Crisis

The President referred to the European crisis and its impact on Argentina. "We managed to accumulate a large amount of reserves that give us a solid driving position as long as the crisis in the Eurozone is not too prolonged and if America can again drive the global economy. Since the data is not encouraging, obviously the markets react and despite all our efforts, this also has an impact on our economy. But we believe that it will have far less impact than it might have in other countries," she said. She took the opportunity to diagnosis and propose a treatment, something that surely will resume next week at the G-20 meeting in Los Cabos, Mexico. "The main problem facing the world today, more than economic, is a lack of clear and consistent

political leadership in addressing the crisis," she said. She explained that in her view the crisis is resolved by strengthening the domestic market, with actions promoting aggregate demand rather than targeting financial sector policies. And although she noted that in the context of the world situation that Argentina cannot advance to the rates of recent years, she said it would take all necessary measures to sustain growth.

She told an anecdote to support her arguments. She said that last year, when she met Nicolas Sarkozy at the Elysee Palace, she suggested to him that, to solve the problems of Greece, they should do something similar to what Argentina did in 2001, which is, a debt restructuring at a discount, "so that the effort is shared." Sarkozy then pulled back and said, "No, that's impossible." "Well," concluded the President, "within a few months, they were talking about a 60 percent haircut in Greece, and today Nicolas no longer presides in France."

I, Spencer Ricks, certify that I am competent to translate Spanish into English and that the translation of this news article is complete and accurate.

_____
Spencer Ricks

Sworn to before me this _14th_ day of _February_, 2013.

_____
NOTARY PUBLIC

EILEEN A. KRAKAUER
Notary Public, State of New York
No. 01KR4637224
Qualified in Queens County
Commission Expires June 8, 2014

# Exhibit 4



Wednesday, May 16th 2012 - 21:58 UTC
State-controlled YPF wants to keep its ADS listed in the New York exchange
**Argentine state-controlled energy company YPF said it risks having its American Depositary Shares (ADS) de-listed by the New York Stock Exchange since it is not complying with all regulatory requirements.**



*President Cristina Fernández extended for another 30 days the intervention of YPF*

### OilSpill Settlement Claim

www.yourlawyer.com

Legal help filing your BP Oil Spill economic loss claimCall1800BIGSPILL



AdChoices ▷

The company stopped complying after the government took administrative control of YPF in mid-April. The president promulgated a law in early May to expropriate a controlling stake in YPF, which was owned by Spain's Repsol.

YPF ADS price sank more than 6% after the news was reported, compared with 2% decline beforehand.

In a filing to the US Securities and Exchange Commission, YPF said it stopped complying with the audit committee requirements as of April 16.

"If we fail to cure this deficiency, NYSE rules provide that the NYSE may initiate suspension and delisting procedures with respect to our securities," the filing said.

"If our ADS are de-listed from the NYSE, there may be a limited market for our ADS; trading in our ADS may become more difficult and the price of our ADS could decrease even further," the company said.

"In addition ... our ability to raise additional capital would likely be impaired".

However a spokesperson said that there is no interest from YPF in stopping trading in the New York Stock Exchange and there is no risk of de-listing.

"Next June 4 the shareholders assembly will formally name the new directors of YPF and then they will decide the naming of the new Audit Committee" according to an official release.

Meanwhile President Cristina Fernández extended for another 30 days the government's intervention on recently partially nationalized oil company YPF. The decree 732/2012 was published Wednesday on the nation's Official Gazette.

Planning Minister Julio de Vido and Deputy Economy Minister Axel Kicillof are to remain as trustees of the oil company. According to the text, the extension is due to the "magnitude and complexity of tasks lying ahead".

Suggested Stories

Feb 13th 2013



Obama challenges Congress to 'take a vote' on a package of progressive reforms

Feb 07th 2013



Argentina says Falklands' issue "smells too much like petroleum

Feb 14th 2013



Argentina's January inflation, 2.58%, highest in 22 months according to private estimates

Feb 14th 2013



New York court agrees to hear bank that supports Argentina in debt restructure case

© Copyright 1997 - 2013, MercoPress.

# Exhibit 5





publicidad

14 de Febrero, 21:56 pm

Regístrate Inicia sesión

Buscar un valor, texto, noticias...

Inicio Noticias Cotizaciones Análisis Técnico Finanzas Personales Opinión Estilo Eventos XL Semanal

Última hora Mercados Empresas **Economia** Vivienda Empleo Agenda macro

| IBEX 35 | MADRID | EURO STOXX50 | DAX | CAC 40 | EUR/USD |
|---|---|---|---|---|---|
| 8.247,40 (-0,71%) | 836,90 (-0,77%) | 2.635,35 (-0,81%) | 7.631,19 (-1,05%) | 3.669,60 (-0,78%) | 1,3350 (-0,70%) |

**EEUU ARGENTINA**

# Fernandez se reúne en Nueva York con el consejero delegado de Exxon Mobil

28/09/2012 **Noticias EFE**

Comentar Twittear 0 Recomendar 0 0 Share

La presidenta de Argentina, Cristina Fernández, se entrevistó hoy en Nueva York con el consejero delegado de la petrolera Exxon Mobil, Rex Tillerson, en el marco de su visita a Estados Unidos para participar en la Asamblea General de la ONU.

El encuentro, que arrancó pasadas las 16:30 horas (20:30 GMT), se celebró en un conocido hotel de la Gran Manzana donde se hospeda la delegación argentina, según confirmó a Efe un portavoz de la presidencia.

De momento no han trascendido detalles de la reunión, de carácter privado, que se produce en el marco de los contactos que están manteniendo las autoridades argentina con potenciales inversores para buscar socios para la petrolera YPF.

Después de la reunión, la presidenta Fernández puso fin a su agenda en Nueva York, desde donde se trasladó a Boston para asistir a un acto en la universidad de Harvard antes de regresar hoy mismo a Buenos Aires.

La presidenta argentina arrancó el lunes su visita a Estados Unidos con una reunión de trabajo con el inversor George Soros y un recorrido por una muestra sobre Evita Perón en el Consulado argentino en Nueva York.

Al día siguiente, Fernández intervino en el pleno de la Asamblea General, desde donde criticó al Fondo Monetario Internacional (FMI), cargó contra las recetas de austeridad para salir de la crisis e incluso denunció la "represión" en España a los "indignados".

La presidenta argentina también aprovechó para volver a exigir a Reino Unido que se siente a dialogar sobre la soberanía de las islas Malvinas, y aceptó una invitación de las autoridades iraníes para abordar el conflicto por el atentado de la AMIA en 2004.

Fernández instruyó al canciller argentino, Héctor Timerman, para que se reúna en Nueva York con su homólogo iraní, un encuentro que todavía no se ha celebrado y que podría tener lugar en los próximos días, según el mismo portavoz consultado por Efe.

La presidenta argentina se trasladó el miércoles a Washington para inaugurar la Cátedra Argentina en la Universidad de Georgetown y entrevistarse con el presidente del Banco Interamericano de Desarrollo (BID), Luis Alberto Moreno.

Comentar Twittear 0 Recomendar 0 0 Share

Publicidad

**Prueba el Nuevo Sandero**
Más beneficios por un precio muy atractivo. ¡Inscríbete para probarlo!
www.dacia.es

**Nissan Juke 117CV**
Te gustará más que el Plan Pive. ¡Reserva una prueba de vehículo gratuita!
www.nissan.es/pruebadevehic

**Las mejores marcas al 70%**
Club de ventas privadas de El Corte Inglés. Las mejores marcas con grandes descuentos.
www.primeriti.es

## DESTACAMOS

**Las cinco asignaturas pendientes en España**
La recuperación no está a la vuelta de la esquina. La...

**Una bolsa no tan periférica como la pintan**
Los gestores de fondos creen que la actual crisis ha dejado...

**Microsoft Surface, la evolución lógica y más práctica del iPad**
La tableta de Microsoft llega a España con la intención de...

## ENVÍA TU CONSULTA

Consultorio de Análisis Técnico
Envía tus consultas a Josep Codina. Las preguntas seleccionadas serán respondidas durante el fin de semana
realiza tu consulta

publicidad

publicidad

## MEJORES PRODUCTOS BANCARIOS

Iniciar sesión con

**Añadir comentario**

Escribe tu comentario aquí.

La actualización en tiempo real está **pausada**. (Continuar)

**Mostrando 0 comentarios**

Ordenar por los más recientes primero

Suscríbete por correo electrónico RSS

Préstamos

- ViaSMS hasta 500 € (http://ahorro.finanzas.com/creditos/viasms/mi -prestamo-viasms/)
  ★★★★★
- Prestamo10 hasta 500 € en 10 minutos (http://ahorro.finanzas.com/creditos/prestamo -prestamo10/)
  ★★★★★
- Cofidis hasta 6.000 €
- Préstamos (http://ahorro.finanzas.com/creditos/? utm_source=ahorro.finanzas.com&utm_mediur -mejores-productos)
- Cuentas (http://ahorro.finanzas.com/cuentas/? utm_source=ahorro.finanzas.com&utm_mediur -mejores-productos)
- Depósitos

Comparardepósitos, cuentas, hipotecas,...

publicidad

Cotizaciones de mercados facilitadas por **Infobolsa**

Quiénes somos · Contacto · Aviso legal · Política de privacidad · RSS

vocento

| | | | | | | |
|---|---|---|---|---|---|---|
| ElCorreo.com | ElComercio.com | ElDiarioMontañes.es | Hoy Cinema | LaRioja.com | Mujer Hoy | Puntoradio |
| Ideal | La Voz Digital | ABC.es | Qué.es | El Norte de Castilla | Las Provincias | La Verdad |
| Diario Vasco | Hoy Motor | Diario Sur | Hoy | Grada 360 | Finanzas.com | ABCdeSevilla.es |

**Fernández Meets in New York With the CEO of Exxon Mobil**

The president of Argentina, Cristina Fernandez, met today in New York with the CEO of oil company Exxon Mobil, Rex Tillerson, in the course of her visit to the United States in order to attend the UN General Assembly.

The meeting, which started just after 4:30 pm (20:30 GMT), was held at a popular hotel in the Big Apple that is hosting the Argentina delegation, a spokesman for the president confirmed to Efe.

So far no details have surfaced regarding the private meeting, which is produced in the framework of contacts by Argentina authorities with potential investors while seeking partners for YPF oil.

After the meeting, President Fernández completed her agenda in New York, from where she traveled to Boston to attend a ceremony at Harvard University before returning to Buenos Aires today.

Argentina's President on Monday kicked off her U.S. visit with a meeting with the investor George Soros and a tour of an Evita Peron exhibit in the Argentine Consulate in New York.

The next day, Fernandez spoke at the plenary of the General Assembly, where she criticized the International Monetary Fund ( IMF ), argued against austerity prescriptions for overcoming the crisis and even denounced the "repression" of the "indignant people" in Spain.

Argentina's President also took the opportunity to again demand that the UK sit and discuss the sovereignty of the Falkland Islands, and accepted an invitation from the Iranian authorities to address the conflict regarding the bombing of the AMIA in 2004.

Fernandez instructed Argentina's Foreign Minister, Hector Timerman, to meet in New York with his Iranian counterpart, a meeting which has not yet been concluded and that could take place in the coming days, according to the same spokesman consulted by Efe.

Argentina's President moved to Washington on Wednesday to inaugurate Argentina's Chair at the University of Georgetown and meet with President of the Inter-American Development Bank (IDB), Luis Alberto Moreno.

I, Spencer Ricks, certify that I am competent to translate Spanish into English and that the translation of this news article is complete and accurate.

Spencer Ricks

Sworn to before me this 14th day of February, 2013.

NOTARY PUBLIC

EILEEN A. KRAKAUER
Notary Public, State of New York
No. 01KR4637224
Qualified in Queens County
Commission Expires June 8, 2014

# Exhibit 6

Case 1:12-cv-04018-TPG   Document 16   Filed 02/15/13   Page 60 of 72

# Argentinian minister Axel Kicillof says country 'will not pay' $10bn compensation for YPF-Repsol

Argentina's deputy economy minister Axel Kicillof raised the stakes in the international row over the country's raid on YPF-Repsol by pledging politicians in Buenos Aires: "We're not going to pay what they say."

Argentina's President Cristina Fernandez de Kirchner has raided state pension funds and increased import taxes without yielding to loud criticism from home and abroad Photo: AFP

By Louise Armitstead

6:38PM BST 18 Apr 2012

Mr Kicillof made the provocative statement at the start of a parliamentary debate on the expropriation of the company that is 57pc owned by Spain's Repsol.

The Spanish company repeated demands for at least $10bn (£6.24bn) of compensation in exchange for the assets that Argentina plans to re-nationalise. Repsol said that YPF, which it bought from the Argentine government for $15bn in 1999, was worth a total of $18bn and it was seeking compensation on that basis.

Britain waded into the escalating diplomatic war that has rallied to Repsol's defence.

William Hague said he was "very concerned" about the move by Argentina's president, Cristina Fernandez de Kirchner, and said the country was in breach of its G20 commitments. "This is the latest in a series of trade and investment related actions taken by Argentina which are damaging to business interests and will undermine Argentina's economy by reducing its attractiveness to international investors," he said.

The Foreign Secretary added: "The Argentine Government has made no secret of the fact that it wishes to reduce imports and boost its domestic trade surplus through a variety of restrictive trade measures.

"This goes against all the commitments Argentina has made in the G20 to promote transparency and reduce protectionism. We will work with Spain and our EU partners to ensure the Argentine authorities uphold their international commitments and obligations."

Meanwhile, Madrid fired more warnings on behalf of Repsol. Spanish Industry Minister Jose Manuel Soria promised "consequences" in the coming days. "They will be in the diplomatic field, the industrial field, and on energy," he said.

Mariano Rajoy, who is in Mexico trying to win support at the World Economic Forum, said Argentina's move was a "negative decision for everyone". The Spanish prime minister, who has little capacity for another financial crisis, added: "I must express my profound unease."

The Spanish cabinet is due to meet on Friday to agree a path of action against Argentina.

However, experts warned that Argentina was likely to remain unmoved under the international pressure. In her five years as president Ms Fernandez de Kirchner has raided state pension funds and increased import taxes without yielding to loud criticism from home and abroad.

Last year Argentina's bill for oil imports shot up 110pc to $9.4bn. In recent weeks, Ms Fernandez de Kirchner has said Repsol had not invested enough in YPF to extract Argentina's oil. The company denies the claim.

Argentina's move reportedly scuppered Repsol's plans to sell YPF to China's Sinopec for $15bn.

© Copyright of Telegraph Media Group Limited 2013

# Exhibit 7

# FULL DISCLOSURE OF CORPORATE EQUITY OWNERSHIP AND IN CORPORATE TAKEOVER BIDS

## HEARINGS

BEFORE THE

## SUBCOMMITTEE ON SECURITIES

OF THE

## COMMITTEE ON BANKING AND CURRENCY

## UNITED STATES SENATE

NINETIETH CONGRESS

FIRST SESSION

ON

# S. 510

A BILL TO PROVIDE FOR FULL DISCLOSURE OF CORPORATE
EQUITY OWNERSHIP OF SECURITIES UNDER THE SECURITIES
AND EXCHANGE ACT OF 1934

MARCH 21 AND 22, AND APRIL 4, 1967

Printed for the use of the
Committee on Banking and Currency



U.S. GOVERNMENT PRINTING OFFICE
WASHINGTON : 1967

75-388

# FULL DISCLOSURE OF CORPORATE EQUITY OWNER-SHIP AND IN CORPORATE TAKEOVER BIDS

### TUESDAY, MARCH 21, 1967

U.S. SENATE,
COMMITTEE ON BANKING AND CURRENCY,
SUBCOMMITTEE ON SECURITIES,
*Washington, D.C.*

The subcommittee met, pursuant to call, at 10:23 a.m., in room 5302, New Senate Office Building, Senator Harrison A. Williams Jr. (chairman of the subcommittee) presiding.

Present: Senators Williams and Bennett.

Senator WILLIAMS. Let the subcommittee come to order.

Today the subcommittee will begin hearings on S. 510, a bill to provide full disclosure of corporate equity ownership and in corporate takeover bids.

The Securities Acts of 1933 and 1934 with their full disclosure requirements have provided sound protection to millions of American stockholders. These laws have worked well in bringing to purchasers of securities full and accurate information on which to make investment decisions. They have encouraged the growth of our Nation's securities markets so that today all are able to invest with confidence knowing that pertinent facts are available.

At present, however, some areas remain where full disclosure is necessary for investor protection but not required. The legislation before the subcommittee today will close what I consider to be a significant gap in these last remaining areas. It requires the disclosure of pertinent information to stockholders where persons seek to obtain control of a corporation by: (1) a cash tender offer and (2) through open market or privately negotiated purchases of securities. Disclosure would also be required when corporations purchase their own stock in the open market.

The takeover bid or cash tender offer has become an increasingly favored method of acquiring corporate control. It is generally cheaper and faster than the proxy solicitation. Also, filings which disclose pertinent facts are not required under the Securities Acts, as they are in proxy contests or where one company offers to exchange its share for those of another. Evidence of the increased use of cash tender offers to acquire corporate control is shown by the fact that in 1960 there were only 8 such offers involving listed companies as compared to 107 in 1966.

1

Under current law, an individual or group can seek control of a publicly held corporation by simply taking an ad in the newspaper stating a willingness to buy a certain number of shares of stock. The purchase price is usually set at a premium of about 20 percent above that at which the stock is being sold, and this may well be attractive to the investor seeking a quick profit.

By using a cash tender offer the person seeking control can operate in almost complete secrecy. He need not state the source of his funds; who his associates are; why he wants to acquire control of the corporation; and what he intends to do with it if he gains control. Unless incumbent management takes newspaper ads explaining its position, the investor has no facts before him on which to base a decision as to whether or not he should accept the offer.

The legislation before us today amends the Securities and Exchange Act to provide for full disclosure in cash tender offers.

Under this bill all pertinent facts concerning the identity and background of the person or group making the tender offer must be disclosed. Stockholders must also be informed as to—

The size of the holdings of the person or group involved.

The source of the funds to be used to acquire the shares.

Any financing arrangements made for these funds and how these arrangements will be liquidated.

The purpose of the tender offer.          .

The plans of the offeror—if he wins control of the company—whether to liquidate it, sell its assets, merge it with another company, or to make major changes in its business or corporate structure.

Under this legislation all persons soliciting tenders must answer these questions. Indeed, anyone acquiring more than 10 percent of a class of an equity security registered under the Securities and Exchange Act will be required to disclose similar information. This is the only way that corporations, their shareholders and potential in-

vestors can adequately evaluate a tender offer or the possible effects of a change in substantial shareholdings.

Finally, the proposed legislation will require corporations purchasing their own stock in the open market to make full disclosure of all pertinent facts. Presently, such disclosure is only necessary in certain instances, always after the fact. However, corporate stock purchase programs may involve large amounts of securities and can have a substantial effect on the market price. In the past, a few of these programs have been used as a device to manipulate the market or to keep management in control. Even where no such purpose exists, market impact can be substantial and undesirable price fluctuations can result. In this area it is obvious that the principle of full disclosure will benefit all investors.

This bill, while protecting investors, will not place undue burdens in the way of honest and fairly conducted business transactions. The Securities Act of 1933 and the Securities and Exchange Act of 1934 are impressive testimonials that full disclosure is not an impediment, but an aid, to such transactions.

It is our Nation's legitimate businessmen as well as the more than 20 million American shareholders who have the most to gain from this legislation. This bill will put all on an equal footing with respect to the availability of significant facts about a tender offer or a corporate stock purchase program. All will be able to deal in the securities markets knowing that all of the pertinent facts are available. This is the premise under which our securities markets are supposed to work. Following this premise they have thrived and prospered over the years. Now is the time to eliminate the last remaining areas where full disclosure is necessary but not yet available.

I now ask unanimous consent that the text of the bill, S. 510, along with a section-by-section explanation, be included in the hearing record.

(The material referred to follows:)

# Exhibit 8



Jueves 8 nov 2012
Versión para imprimir

## ECONOMÍA

PETROLERA

# Santa Cruz prorrogó las concesiones de YPF

Además se aprobó el acuerdo firmado entre el gobierno nacional y Santa Cruz para el traspaso del 5,5% de las accio
a la provincia cuyo valor se estipulará "una vez que finalice el proceso de expropiación a Repsol".

La Cámara de Diputados de Santa Cruz ratificó hoy el acuerdo firmado entre el gobernador Daniel Peralta e
prorrogar las concesiones hidrocarburíferas de la principal operadora petrolera de la provincia.

Además se aprobó el acuerdo firmado entre el gobierno nacional y Santa Cruz para el traspaso del 5,5% de
acciones de YPF a la provincia cuyo valor se estipulará "una vez que finalice el proceso de expropiación a R

En tanto, el acuerdo de prórroga de las concesiones firmado el 2 de noviembre entre el presidente de YPF,
Galuccio y el gobernador santacruceño fue aprobado por mayoría gracias al voto de la totalidad del bloque
para la Victoria.

La extensión por 25 años de las concesiones petroleras que YPF explota en la provincia implicarán a su vez
un canon por prórroga de poco más de 200 millones de dólares que será cancelado en cuotas por la operad
febrero de 2015.

Las áreas en las que se extenderán las concesiones son Cerro Piedra-Cerro Guadal Norte, Cañadón de la B
Las Heras, Cañadón León-Meseta Espinosa, Los Monos, Pico Truncado-El Cordón, Los Perales-Las Meset
Guadal-Lomas del Cuy, Cañadón Vasco, Cañadón Yatel y la porción del área Magallanes situada en el terri
Santa Cruz.

El acuerdo incluye además el trámite de concesión del área Barranca Yankowsky. El jefe de bloque del Frer
Victoria, Rubén Contreras, afirmó que "YPF es una empresa donde todos los argentinos tenemos parte. Cos
muchísimos años poder levantarla porque a su ingreso nos encontramos con una empresa que no había he
inversiones".

"El acuerdo es sumamente positivo para la provincia porque oxigena la economía. Ahora le alcanza y sobra
para pagar los sueldos. Seguramente tendrá problemas para pagar los aguinaldos" admitió Contreras, quier

YPF invertirá en Santa Cruz 4.650 millones de dólares en los próximos 5 años y en mantenimiento erogará
millones de dólares en 2013-2020.

La diputada radical Estela Bubola aseguró que "este acuerdo que se firmó con YPF es un poco apresurado"
que implica "la continuidad de este proceso de entrega de uno de los recursos estratégicos que tenemos en
provincia" y que la prórroga "es un triste salvavidas para que el Ejecutivo pueda pagar los sueldos".

Su par de bancada Héctor Roquel añadió que "este pacto es lesivo para los intereses de Santa Cruz" y aseg
"cuando era Repsol hablábamos de un pasivo ambiental de 4 a 6 mil millones de dólares y hoy nos pagarán
de dólares anuales durante 5 años".

Recordó las fuertes críticas que despertaron las prórrogas que el gobierno provincial concedió a Pan Americ
en 2007 "parecen un buen negocio al lado de esto".

"¿Por qué motivo quieren convalidar esto a libro cerrado? ¨para demostrar que no son destituyentes?", se p
Roquel. El justicialista Atanasio Pérez Osuna aseveró que "votamos lo que nos pidió el gobernador Peralta |
santacruceños puedan cobrar salarios y jubilaciones".

"Peralta debe terminar su mandato pero que se ponga a gestionar, gobernar y resolver los problemas de los
santacruceños" acotó sobre la disputa que mantiene el bloque mayoritario con el Ejecutivo provincial.

**Santa Cruz extended YPF concessions**

It also approved the signed agreement between the national government and Santa Cruz for the transfer of 5.5% of the shares of YPF to the province whose value will be stipulated "at the conclusion of the Repsol expropriation process."

The Chamber of Deputies of Santa Cruz today ratified the signed agreement between Governor Daniel Peralta and YPF to extend oil and gas concessions from the main oil operator in the province.

It also approved the signed agreement between the national government and Santa Cruz for the transfer of 5.5% of the shares of YPF to the province whose value will be stipulated "at the conclusion of the Repsol expropriation process."

Meanwhile, the agreement for extension of concessions signed on November 2 between the president of YPF, Miguel Galuccio and the Santa Cruzean governor was approved by a majority vote of support from the entire Front for Victory voting bloc.

The 25-year extension of the YPF oil concessions that are extracted in the province requires the payment of an extension fee of just over $200 million to be repaid in installments by the operator until February 2015.

The areas where the concessions will be extended are Cerro Piedra-Cerro Guadal Norte, Cañadón de la Escondida-Las Heras, Cañadón León-Meseta Espinosa, Los Monos, Pico Truncado-El Cordón, Los Perales-Las Mesetas, El Guadal-Lomas del Cuy, Cañadón Vasco, Cañadón Yatel and the portion of the Magallanes area located in the territory of Santa Cruz.

The agreement also includes the granting transaction for the Yankowsky Canyon area. The block leader of the Front for Victory, Ruben Contreras, said "YPF is a company that all Argentines share. It will take many years to rejuvenate it, because at the start we find ourselves with a company had not made investments."

"The agreement is very good for the province because it oxygenates the economy. Now it is more than enough to pay government salaries. Surely it will have trouble paying bonuses," admitted Contreras, who said Santa Cruz YPF will invest 4.65 billion dollars in the next five years and will spend 4.926 billion dollars on maintenance from 2013-2020.

The opposition deputy Bubola Estela said, "This agreement signed with YPF is a bit hasty," he argued that it involves "the continuation of this process of giving away one of the strategic resources we have in the province" and that the extension "is a sad lifesaver so that the Executive can pay salaries."

His bench pair Hector Roquel added that "this agreement is harmful to the interests of Santa Cruz" and said that "when it was Repsol, we were talking about an environmental liability of 4 to 6 billion dollars and today they will pay us $20 million annually for 5 years."

He recalled the strong criticism of the extensions granted by the provincial government in the 2007 case of Pan American Energy, which "looks good next to this business."

"For what reason do they want to validate this to closed book? To show that they are not destitute?" Asked Roquel. The Justicialist Atanasio Perez Osuna said that "We voted how Governor Peralta asked us, so that Santa Cruzeans can collect salaries and pensions."

"Peralta should finish his term but he should manage, govern and solve the problems of Santa Cruzeans" he said concerning the dispute with the majority bloc in the provincial Executive.

I, Spencer Ricks, certify that I am competent to translate Spanish into English and that the translation of this news article is complete and accurate.

_____
Spencer Ricks

Sworn to before me this 14th day of February, 2013.

NOTARY PUBLIC

EILEEN A. KRAKAUER
Notary Public, State of New York
No. 01KR4637224
Qualified in Queens County
Commission Expires June 8, 2014