D9q2repA

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

REPSOL YPF, S.A.,
REPSOL, S.A.,

                    Plaintiffs,
                                        12 Civ. 3877 (TPG)
             v.                         12 Civ. 4018 (TPG)
                                        12 Civ. 8799 (TPG)
REPUBLIC OF ARGENTINA,
CHEVRON CORP.,
                                        Argument
                    Defendants.
------------------------------x
                                        New York, N.Y.
                                        September 26, 2013
                                        11:10 a.m.
Before:

         HON. THOMAS P. GRIESA

                                        District Judge


         APPEARANCES


QUINN EMANUEL URQUHART & SULLIVAN LLP
     Attorneys for Plaintiff Repsol, S.A.
BY:  RICHARD WERDER, JR.
     STEPHEN A. BROOME


WILSON SONSINI GOODRICH & ROSATI P.C.
     Attorneys for Defendant Chevron
BY:  MICHAEL S. SOMMER
     JESSICA MARGOLIS

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D9q2repA

```
 1              THE DEPUTY CLERK:  Continuation of oral argument,
 2    Repsol v. Chevron.
 3              THE COURT:  Let me start with some remarks.  I think
 4    there is some possible confusion in the briefing, and I would
 5    like you to state what might be a preliminary but basic issue.
 6              If Chevron committed some tort or breach of contract,
 7    it can be liable for that even though the result was the
 8    republic stopping doing business with Repsol or appropriating
 9    the Repsol shares.  In other words, if there was some
10    wrongdoing by Chevron, the fact that ultimately there was this
11    action by the republic does not relieve Chevron of liability of
12    its tort or breach.  I think that in the briefing that was not
13    so clear, and it is very clear in my mind.
14              The question is, does Repsol allege some wrongdoing on
15    the part of Chevron?  The complaint is not all that clear.
16              Who is here representing the plaintiff?
17              MR. WERDER:  Richard Werder from Quinn Emanuel, your
18    Honor.
19              THE COURT:  You weren't here last time.
20              MR. WERDER:  I was not, your Honor, but I did read the
21    transcript.
22              THE COURT:  What do you have to say?  There were
23    certain issues obviously left open at the end of that hearing,
24    and then I had my discussion this morning as you heard.  What
25    do you now say?
```

D9q2repA

1          MR. WERDER:  Well, your Honor, laying aside the counts

2     of the complaint that don't necessarily require wrongdoing by

3     Chevron and just focusing in on the tortious interference

4     claim, Chevron did not challenge the adequacy of our pleading

5     of the claim.  What the claim alleges, we believe, is that

6     Repsol had a contractual right to control the development of

7     significant new energy assets that Repsol, through its

8     subsidiary YPF, had discovered in Argentina.  And that right,

9     your Honor, was conveyed or conferred by the bylaws and

10    protected by the bylaws of YPF.  Argentina could take that --

11         THE COURT:  Look.  I don't say that I disagree with

12    that, but this emphasis on the bylaws, the question was did

13    Chevron come in and not cause a violation of a bylaw, but did

14    Chevron come in, according to the plaintiff, and improperly

15    deprive Repsol of its business relationship?  Not of the bylaw,

16    but of the business relationship.  Do you allege that or don't

17    you?

18         MR. WERDER:  Well, your Honor, the contract that we

19    allege was breached is the bylaw.  The contract that we allege

20    that Chevron tortiously interfered with is the bylaw.  That is,

21    the contract that's at issue here.  Now, that contract is

22    obviously intimately tide up in the business relationship

23    because that's the contract that gives Repsol the right to

24    control the development of these assets.  And we allege that

25    Chevron --

D9q2repA

1          THE COURT:  Say the latter again.

2          MR. WERDER:  Yes, your Honor.

3          The bylaws are the contract that we allege was

4     interfered with, but the bylaws are what gave Repsol the right

5     to control the development of the asset it had discovered in

6     Argentina.  And what we allege, your Honor, is that Chevron

7     very much wanted to participate in developing the asset that

8     Repsol had discovered, and we allege that in exchange for

9     receiving from the government of Argentina an interest in that

10    asset, Chevron improperly --

11         THE COURT:  What asset?

12         MR. WERDER:  The Vaca Muerta field that Repsol

13    discovered.

14         THE COURT:  All right.  I understand.  Go ahead.

15         MR. WERDER:  So the thesis of our complaint, your

16    Honor, is that Repsol discovered this asset, had a right to

17    control it.  Chevron wanted to participate in developing the

18    asset, and they really did two things.  They met with Argentina

19    in advance of the expropriation to discuss obtaining an

20    interest in the asset, not through negotiations with us, Repsol

21    but, rather, through negotiations with Argentina at the same

22    time that they were negotiating with us.  And they provided

23    Argentina, contrary to what --

24         THE COURT:  What were they negotiating with your

25    client about?

D9q2repA

1          MR. WERDER:  They were negotiating with YPF, under our

2     client's control, for an ability to come in and partner up on

3     the development of the asset.  And at the same time they were

4     doing that, your Honor, they were talking separately, the

5     complaint alleges, to Argentina.  And Argentina went to them

6     and had discussions with them and disclosed to them that

7     Argentina was thinking about taking the right to develop this

8     field away from Repsol.  And in order to do that, we allege,

9     Argentina needed the assurance of a company like Chevron that

10     they would not be a pariah as a result of having done that.

11          And we allege that at the same time that Chevron was

12     negotiating with us, they were negotiating or discussing with

13     Argentina and that they provided assurance that they would be

14     there ready, willing, and able to do a deal and provide the

15     resource that Argentina would need in the absence of the

16     resource that Repsol was providing.

17          THE COURT:  Do you claim that they talked to Argentina

18     without disclosing that to your client?

19          MR. WERDER:  Yes, your Honor.

20          THE COURT:  You go ahead with what you were saying.

21          MR. WERDER:  So the pre-expropriation conduct that we

22     allege, your Honor, is that while they were talking to us, they

23     talked to Argentina without our knowledge and gave Argentina

24     the assurances that Argentina needed to proceed with whatever

25     plan they were developing to take over this asset and the right

D9q2repA

```
 1    to develop the asset from Repsol.  And we allege that without

 2    the assurance that Chevron provided in advance, Argentina would

 3    have had its hands tied and would not have been able to proceed

 4    with its plan.

 5              Separately we allege, your Honor, that after Argentina

 6    had taken the actions that it took to displace Repsol, knowing

 7    that the subsequent actions were in violation of Repsol's

 8    contractual rights, Chevron went ahead and did a transaction.

 9    They entered into a memorandum of understanding.  And since the

10    complaint, they have entered into a more formal contract that

11    also is in derogation of Repsol's rights.  So we are alleging,

12    your Honor, that prior to the expropriation, Chevron gave

13    Argentina the comfort and assurance that it needed to proceed

14    with its plan to oust us; and then that, after that was

15    accomplished, then Chevron was able to step in and negotiate a

16    transaction with Argentina for the development of these assets.

17              And it is not part of our complaint, but it is part of

18    the public record, because some of this occurred since we filed

19    the complaint, but if we need to, we think we could prove and

20    we would allege if we needed to amend the complaint, that the

21    transaction that they have entered into with Argentina has a

22    lot of sweetheart type provisions for them.  So they got some

23    benefits out of dealing directly with the Argentines, again, in

24    violation of our rights.  That's our theory of the case.

25              THE COURT:  Explain when you say "sweetheart."
```

D9q2repA

| | |
|---|---|
| 1 | MR. WERDER:  Yes, your Honor.  They, for example, |
| 2 | according to published reports, we haven't seen the final |
| 3 | agreement that they have entered into, even though we have two |
| 4 | members on YPF's board of directors, still, we haven't seen the |
| 5 | agreement, but according to published reports, the structure of |
| 6 | the deal that they have entered into with YPF under the control |
| 7 | of the improperly appointed managers who were appointed in |
| 8 | violation of our contractual rights, the structure of that deal |
| 9 | in terms of the split of expenses and the split of profits is |
| 10 | quite favorable to Chevron and more favorable than commentators |
| 11 | would expect. |
| 12 | They also got the right, pursuant to legislation that |
| 13 | Argentina passed immediately prior to signing the final deal |
| 14 | with Chevron, to export 20 percent of the production from this |
| 15 | field without paying any tax on it and without having to |
| 16 | repatriate the profits to Argentina. |
| 17 | And, in addition to that, they got an extension of the |
| 18 | concession period covering the oil and gas assets. |
| 19 | So they got a number of things out of this transaction |
| 20 | that we would characterize as a sweetheart deal. |
| 21 | THE COURT:  Now, Repsol owned, what is the company's |
| 22 | name? |
| 23 | MR. WERDER:  YPF, your Honor. |
| 24 | THE COURT:  YPF. |
| 25 | How much of YFP did Repsol own before the |

8

D9q2repA

1    expatriation.

2           MR. WERDER:  In history they owned more, your Honor,

3    but in the period immediately preceding it, they owned

4    approximately 57 or 58 percent.

5           THE COURT:  Now, was there a contract or were there

6    contracts between Repsol and YFP aside from the stock

7    ownership?

8           MR. WERDER:  Yes, your Honor.  There were various

9    contracts, but not that is alleged in the complaint.  As I

10   said, the contract that we alleged was breached and that was

11   tortiously interfered with is the bylaws, which are of course a

12   contract and are recognized not only under U.S. law as a

13   contract but are recognized under Argentine law as a contract

14   as we have alleged.

15          THE COURT:  In what way was that breached?

16          MR. WERDER:  Well, the bylaws were breached really in

17   two separate ways, your Honor, at least two separate ways.

18          One is that Argentina, in breach of the bylaws, took

19   control of 51 percent of Repsol's 57 or 58 percent without a

20   tender offer, which you heard at the last hearing, which they

21   were required contractually to do to take control.  That's one.

22          And, two, after they did that, even though pursuant to

23   the contractual requirements of the bylaws they are not

24   entitled to vote shares that were acquired without complying

25   with the provisions of the bylaws, they have appointed managers

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

D9q2repA

who have entered into these agreements with Chevron, which we

allege are also agreements that were entered into in breach of

the bylaws.

THE COURT:  How much stock did the republic

appropriate?  51 percent?

MR. WERDER:  They took 51 percent of the 57 or 58

percent that we had.  So they had some shares previously as

well, but what they took from Repsol were 51 percent, what are

the class D shares, your Honor.  It's probably a little more

detail than you need, but I think 51 percent would be the

number to have in mind.

THE COURT:  51 percent of your client's 57.

MR. WERDER:  Yes.  So if you worked it out on a

percentage basis, it would be 51 over 57 or 58, or 51 divided

by 57 or 58.  I'm not quick enough to do the math on my feet,

but it is, what?  80 percent?

THE COURT:  Let's focus on the bylaw situation a

moment.  Obviously the republic didn't buy shares from your

client.  It appropriated shares.

MR. WERDER:  That is correct, your Honor.

THE COURT:  They appropriate the shares.  Exactly what

is your claim about a tender offer?  Is it that they cannot do

that without making a tender offer or the tender offer must

come after that?  What exactly -- what is your claim?

MR. WERDER:  I think our claim is, your Honor --

D9q2repA

1          THE COURT:  I don't have the bylaws in front of me.

2     What do the bylaws say?

3          MR. WERDER:  The bylaws say that in order to acquire

4     those shares, that percentage of the shares, that the

5     acquisition needs to be done pursuant to a tender offer.  And

6     the bylaws also say that if shares are acquired in violation of

7     that requirement, then they are stripped of their right to

8     vote.

9          THE COURT:  Let's go back.  Say it again.

10          MR. WERDER:  Yes, your Honor.

11          The bylaws require that if Argentina is going to

12     effectively renationalize all or part of YPF, at least at the

13     percentage level that we are talking about, that they need to

14     do it through a tender offer so that the tender offer --

15          THE COURT:  How much of YPF do they own now?

16          MR. WERDER:  Now they own our 51 percent of the class

17     D -- they control them actually.  I think they actually may

18     have the shares somewhat in a state of limbo, your Honor, where

19     they haven't actually asserted ownership of them.

20          THE COURT:  I'm not worried about that.

21          MR. WERDER:  51 percent of the class D and all of

22     the --

23          THE COURT:  Class D is what your client owned.

24          MR. WERDER:  Correct, your Honor.  Those are the

25     shares that were -- when they, as the complaint alleges, back

D9q2repA

```
1    in history unnationalized the formerly national oil company,

2    the class D shares are what were offered to the investment

3    community and what our clients bought.  And so the bylaws

4    require --

5              THE COURT:  Class D voting shares?

6              MR. WERDER:  Yes, your Honor.

7              So if you think about the situation, your Honor --

8              THE COURT:  Look.  I am not completely savvy on these

9    details.  Class D, there are other classes?

10             MR. WERDER:  I think there are four classes, your

11   Honor.  There is class A, class B, class C and class D.  I

12   believe there were some provisions that provide for the class B

13   and class C to become class A under certain circumstances.  So

14   I'm not actually sure that the class B and the class C still

15   exist.  But those were shares that were created for, I

16   believe -- one of them was create for employees of YFP.  The

17   other was created for some of the regional governments in

18   Argentina.

19             THE COURT:  Let's suppose you own 51 percent of class

20   D.  You own a controlling share --

21             MR. WERDER:  Right.  Correct, your Honor.

22             THE COURT:  -- in effect.

23             MR. WERDER:  Yes.  We had a controlling share.  And,

24   in fact, what they specifically designed their actions to do,

25   your Honor, was not to expropriate the whole --
```

D9q2repA

1          THE COURT:  Did your client own 57 percent of class D?

2          MR. WERDER:  Yes.

3          THE COURT:  The expropriation took away that control.

4          MR. WERDER:  Yes, and was specifically designed, we

5    believe, to take away the control.  There are other, as you

6    heard about at the last hearing, your Honor, there are other

7    holders of class D who are still out there holding those shares

8    and those have not been expropriated at this point.  They took

9    just enough to assert control over the entity.

10          THE COURT:  Let's go back to the bylaw, the tender

11    offer.  You said it about five times, but say it once more.

12    What is the requirement about the tender offer?

13          MR. WERDER:  The requirement about the tender offer,

14    your Honor, there are two provisions of the bylaws that are

15    operative.  It is section 7 and section 28, and the requirement

16    is, parsing it to apply to this situation, if Argentina seeks

17    to acquire control, they need to do that through tender offer,

18    which has pricing mechanisms that were designed to protect

19    investors such as Repsol.  That's point number one.

20          And point number two is, if they effect the seizure of

21    control without having conducted a tender offer, then according

22    to the bylaws, the shares that they acquire do not carry with

23    them the rights to vote.

24          THE COURT:  Let's go back to the step one.

25          MR. WERDER:  Yes, your Honor.

D9q2repA

| | |
|---|---|
| 1 | THE COURT:  Let's assume, as I guess has happened, |
| 2 | Argentina decides to acquire control.  You are saying that they |
| 3 | must acquire that control -- I am interrupting myself. |
| 4 | YPF must make the tender offer, right? |
| 5 | MR. WERDER:  The inquirer must make the tender offer. |
| 6 | THE COURT:  Oh, the republic had to make the tender |
| 7 | offer. |
| 8 | MR. WERDER:  I believe that's the way it works, your |
| 9 | Honor.  The structure of it is if someone comes in and wants to |
| 10 | acquire shares of YPF from the owners and those shares amount |
| 11 | to a control stake, that one -- in this case the republic -- |
| 12 | needs to conduct a tender offer pursuant -- |
| 13 | THE COURT:  Let's suppose they have done it right. |
| 14 | MR. WERDER:  Yes, your Honor. |
| 15 | THE COURT:  So the republic makes a tender offer. |
| 16 | What does that actually involve? |
| 17 | MR. WERDER:  Well, your Honor, there are a number of |
| 18 | technical requirements for how the tender offer gets conducted. |
| 19 | But what it would involve would be publication of notice of the |
| 20 | offer; compliance with the requirements that jurisdictions, |
| 21 | such as the New York Stock Exchange, would have; and most |
| 22 | importantly, probably, your Honor, it requires that the offer |
| 23 | be made pursuant to terms of the bylaws that dictate how the |
| 24 | price will be established. |
| 25 | So in order comply with the requirements to -- |

D9q2repA

1          THE COURT:  In other words, a tender offer is a offer

2     at a certain price.

3          MR. WERDER:  A tender offer is an offer at a certain

4     price, and the bylaws contain provisions that speak to how that

5     price is to be determined in the event that a tender offer, in

6     compliance with the bylaws, is to be conducted.

7          THE COURT:  What's the practical benefit of having a

8     tender offer?  In other words, if the republic is going to

9     offer to buy X percentage, it can do that through tender offer,

10    right?

11         MR. WERDER:  Basically what it is, your Honor it is

12    price protection, right?  If you think back to the situation

13    that existed in history, Argentina had a national oil company.

14    Argentina wanted to get private investors to buy that company.

15    They came to the United States.  They conducted an IPO.  If you

16    think about the history of Argentina, you might think, well,

17    what kind of protection is an investor going to want in order

18    to agree to buy these shares off them so that they are not

19    subject to having them taken back the next day or at some point

20    in the future?  And the protection that was designed and

21    implemented as part of this IPO process back in the 1990s was

22    that they contractually agreed that if we ever are going to

23    renationalize this company, we are going to do it in a way that

24    protects the legitimate interests of the people that are coming

25    forward to invest in the shares.

D9q2repA

1            THE COURT:  How are they protected?

2            MR. WERDER:  They are protected, your Honor, because

3    the tender offer provisions for the bylaws established the

4    mechanic for how a tender offer is going to be carried out and

5    what price is going to be paid.

6            So Argentina, if it were to comply with the provision

7    of the bylaws, would be in a situation where it would have to

8    buy these shares at the pricing level that is determined

9    through the mechanism that's established by the bylaws.

10           THE COURT:  Can a tender offer be an offer to buy a

11   particular body of shares like Repsol?  Why can there be a

12   tender offer to buy Repsol shares?

13           MR. WERDER:  No, your Honor.  That doesn't work.  I

14   believe the way the bylaws work, and this is one of the other

15   cases that you had in front of you at the last hearing, but

16   they are required to purchase, I believe, the way the bylaws

17   work, they are required to purchase all of the class D shares.

18   So they can't just buy 51 percent at a market price and leave

19   the other 49 percent hanging out there without any ability of

20   the owners of those shares to monetize them pursuant to the

21   provisions.

22           THE COURT:  The tender offer has to be for the

23   whole --

24           MR. WERDER:  That's correct, your Honor, yes.  That's

25   why you have this other case I believe, in front of you where

D9q2repA

1    there continue to be class D owners of shares that also have

2    not had the benefit of the contractually required tender offer.

3    But effectively, your Honor, the pricing provision of the

4    bylaws is intended to provide assurance, contractual assurance

5    to investors that if their shares are going to be acquired by

6    Argentina that it happens at a market price.

7              THE COURT:  I take it a tender offer can be rejected.

8    In other words, if a tender offer is made for all the class D

9    shares --

10             MR. WERDER:  Correct, your Honor.

11             THE COURT:  -- somebody can refuse it.

12             MR. WERDER:  Correct.

13             THE COURT:  And Repsol could refuse it, just going

14   that far.

15             MR. WERDER:  Yes.  And then if they want to --

16             THE COURT:  Without speaking about expropriation now,

17   a tender offer could be refused by Repsol.

18             MR. WERDER:  Correct, your Honor.

19             THE COURT:  What I don't quite understand is the

20   relationship between a tender offer and an expropriation.

21   Because there was an expropriation, right.

22             MR. WERDER:  There was a statute that was passed that

23   has been described as an expropriation and that we describe as

24   an expropriation, yes, your Honor.

25             THE COURT:  Now, your client is not suing in this

D9q2repA

1   action or any other action to overturn the expropriation,

2   right?

3          MR. WERDER:  Your Honor, there is a complex set of

4   procedures that are going on.  There is an arbitration.  But

5   not in this action.  In this action, our client is not seeking

6   to have this court say anything about the legality of the

7   statute that Argentina passed.  That's not part of our case.

8   But there hasn't been any compensation, and certainly

9   compensation is being sought for the shares that have been

10  expropriated but not in this case.

11         THE COURT:  Let us assume that the expropriation is a

12  fact of life and there may be issues about compensation and so

13  forth.  But the expropriation is done.

14         I guess I am going back to something I have asked

15  numerous times, but I will ask it again.

16         MR. WERDER:  That's fine, your Honor.

17         THE COURT:  Your claim is that the republic did not

18  comply with the bylaws in that the republic didn't make a

19  tender offer.  What that means to me right now is that the

20  republic did not comply with the bylaws because it made an

21  expropriation rather than an tender offer and I emphasize

22  "rather than."  Do you understand me?

23         MR. WERDER:  I think I understand what you are saying,

24  your Honor.

25         THE COURT:  Am I correct, as far as your contention.

D9q2repA

1          MR. WERDER:  Well, our contention is that, separate

2     and apart from any legislation that they might pass, they were

3     laboring under a contractual obligation set forth in the bylaws

4     to proceed through a tender offer or bear the consequences of

5     not having done so from a contractual perspective, your Honor.

6          THE COURT:  Don't we end up where I said?  In other

7     words, they had a contractual obligation, let's call it that,

8     sounds okay, they had the obligation to make the tender offer.

9          MR. WERDER:  Yes.

10          THE COURT:  The bylaws required it.  I don't think

11     anybody denies that.  They didn't make the tender offer.  They

12     expropriated the shares, no tender offer --

13          MR. WERDER:  Correct, your Honor.

14          THE COURT:  -- then or now.

15          Now let's get back to Chevron.

16          MR. WERDER:  Yes, certainly.

17          THE COURT:  I think one of your claims, and maybe it

18     is the most prominent thing in your complaint, is that Chevron

19     committed the tort or the wrongdoing of inducing the republic

20     not to comply with the bylaws.  Is that what you are claiming?

21          MR. WERDER:  Yes, your Honor.  That's the

22     pre-expropriation, pre-seizure conduct.  There is a separate

23     aspect after that's accomplished, but effectively what we are

24     alleging, your Honor, is exactly that; that before it would be

25     able to take this drastic step --

D9q2repA

1          THE COURT:  Before who would be able?

2          MR. WERDER:  Before Argentina would be in a position

3     where it would be able to take this drastic step of seizing

4     these shares without complying with its contractual

5     requirements, Argentina needed assurance from somebody like

6     Chevron because Argentina, on its own, without Repsol, wouldn't

7     have the ability to develop these assets.  So they would

8     basically seize control of the assets by seizing our shares and

9     then be left there with a bunch of oil and gas in the ground

10    that they would not be able to monetize.  That's the allegation

11    of the complaint.  So recognizing that, they had discussions

12    with various oil companies, including Chevron, and Chevron

13    provided them with assurance that, yeah, go ahead, no problem.

14    Seize these shares.  We will be there.  We will do business

15    with you without regard --

16          THE COURT:  Doesn't that mean, at least on this part

17    of your argument, what we are talking about now, that the

18    injury was the expropriation instead of the tender offer?

19    Isn't that the injury you are alleging?

20          MR. WERDER:  The injury is the loss of the rights that

21    we have under the bylaws to control this company without

22    compliance with the provisions of the bylaws.

23          THE COURT:  I don't understand that.

24          MR. WERDER:  Well, if the bylaws were complied with,

25    your Honor, we would have received market price for our shares,

D9q2repA

1    the bylaws would not have been breached, and we wouldn't be

2    here --

3              THE COURT:  In other words, are you saying that if the

4    tender offer had been made, your client would have accepted it,

5    but it would have gotten a better price than they are getting

6    now?

7              MR. WERDER:  Well, they are not getting any price

8    right now, your Honor.

9              THE COURT:  But I'm -- look, this makes a difference.

10             MR. WERDER:  Understood, your Honor.

11             We don't have any allegations about what would have

12   happened if a tender offer had been made.  The complaint does

13   not contain any allegations concerning that.

14             THE COURT:  Yes, but as a judge looking at the

15   complaint, I have got to see where you are going.  The thing

16   is, the republic being there, the Act of State Doctrine and the

17   Foreign Sovereign Immunities Act loom large in dealing with

18   anything about the republic.  It isn't a private party.

19             MR. WERDER:  Yes, your Honor.

20             THE COURT:  I have got to see are we going somewhere

21   in this action that runs right head on into the Act of State

22   Doctrine or the Foreign Sovereign Immunities Act.  That

23   question is raised because if your client is complaining about

24   the lack of a tender offer, the injury being we couldn't keep

25   our class D shares, in other words, we would have refused the

D9q2repA

1    tender offer and we would still have our class D shares, that's

2    one thing that can happen in a tender offer.  They can refuse

3    it.  But if your client is saying, no, we are not saying we

4    would have refused it, but we would have gotten a better price,

5    that's our damage.  In other words, is the injury here the loss

6    of the class D shares or is the injury here having to do with

7    the price paid?

8             MR. WERDER:  Well, the injury, your Honor -- there may

9    well be injury having to do with the price paid once that price

10   is ever determined down the road, but that's not the injury

11   that is the subject of this complaint.

12            THE COURT:  What is the injury, then?

13            MR. WERDER:  The injury that's the subject of this

14   complaint is the loss of control over the development of this

15   asset that Repsol discovered while it was managing YPF.

16            THE COURT:  That's a very clear-cut answer, but I

17   really didn't get that clearly defined in the complaint, and

18   certainly the discussion has clarified it.

19            Now --

20            MR. WERDER:  And we can amend for that, your Honor,

21   obviously, if it is not as clear as you would like it to be.

22   But that is the -- this is not a case that has to do with share

23   price.

24            THE COURT:  It is about the loss of the shares.

25            MR. WERDER:  It is about the loss of the shares and

D9q2repA

1    what attends the loss of the shares which is the loss of the

2    right to control the development of what has been described as

3    the third largest deposit of shale oil and gas in the world.

4            THE COURT:  This discussion has been a dialogue

5    between you and me, and I haven't heard from the other side.  I

6    know that the other side would say that there are fatal

7    problems with the kinds of claims that we are talking about.

8            What I am going to do, without really further

9    discussion, is I am going to grant the motion to dismiss with

10   leave to replead.  If your case is going to survive, there

11   really has to be an amended complaint clarifying the things

12   that you have developed here in your statements to me, which I

13   do not think are really spelled out in the complaint and need

14   to be spelled out.  You and your client have to consider what

15   it is that you can in good faith plead.

16           Now I am going back to the very beginning of our

17   morning, and that is, if you and your client wish to amend and

18   have one or more causes of action alleging interference with

19   Repsol's rights by going secretly to the republic when they are

20   talking to you and so forth, you remember what we talked

21   about --

22           MR. WERDER:  Yes, your Honor, certainly.

23           THE COURT:  -- if you feel that that is a cause of

24   action that you wish to plead, it has to get into the

25   complaint, and it is not there now.  Maybe there is some

D9q2repA

1    conclusory language, but nothing of the kind that you have

2    really spelled out here this morning.

3            Now, also, if you wish to allege that Chevron caused

4    or induced the republic into violating the bylaw with the

5    result that your client was deprived of the shares and the

6    right to pursue the oil and gas, if you feel you wish to amend

7    and spell that out and can do it in good faith, then you have

8    the opportunity.  But right now, the things that you have

9    spelled out to me this morning are really not in the complaint;

10   and if the case is going to survive, there must be specifics

11   along the lines that you have described to me this morning.

12   Then if there are those specifics, then there are.  Then the

13   other side has something that constitutes a pleading with real

14   meaning, and of course they will answer or move against this

15   amended complaint.

16           So the motion to dismiss the complaint is granted for

17   the reasons indicated on the record here, with leave to

18   replead.

19           Thank you very much.

20           MR. WERDER:  Thank you, your Honor.

21           MR. SOMMER:  Thank you, Judge.

22                                    - - -

23

24

25